*98 Defendant and Whisman were having drinks at Whisman's hotel when Defendant texted Allen and asked Allen to join them. Whisman had never met Allen, but she had heard a lot about him from Defendant, and testified: "In fact, I [honestly] believed they were brothers." Allen left work at approximately 6:30 p.m. and joined Defendant and Whisman at the hotel. All three possessed valid concealed carry permits and were armed. Allen visited with Defendant and Whisman before he left to return home in his Jeep. Shortly thereafter, Defendant drove Whisman in her Jeep back to the house, and stopped on the way to purchase beer. At the house, Allen joined Defendant and Whisman on the porch and all three drank some beers.
All three continued to drink and things were, according to Allen, "happy go lucky, joking around" until later in the night, when Whisman stated that she wanted to go back to her hotel. Defendant stated that, because he was planning to drive Whisman back to her hotel that night, he had stopped drinking at approximately 9:30 p.m., but that Whisman was intoxicated at the time she asked to leave the house.
Allen testified concerning Whisman: "She was happy throughout the whole night, obviously became more and more intoxicated throughout the night, and she wanted to leave." Allen testified that because of Whisman's condition, he "asked her to stay, stick around. I told her she could sleep [anywhere in the house], just stay here. She agreed." According to Allen, after the first time he asked Defendant and Whisman not to leave, they all "continued to drink and laugh and joke and have fun." Allen testified that only later did Whisman again state her desire to leave, and that "[Defendant] and [ ] Whisman decided they were going to go jump in [Whisman's] Jeep." A llen believed at the time Whisman attempted to leave that she was impaired, but that Defendant was not impaired. However, Allen did not want Defendant to drive anywhere at that time because Defendant had been drinking. Neither Whisman nor Defendant corroborated Allen's testimony concerning this initial encounter.
Whisman testified that, after a few hours of drinking at the house, she wanted to return to her hotel room. When she told Defendant and Allen that she wanted to leave, Defendant "was cool with it. And I guess [Allen] was okay with it until it was a reality, and then he wasn't okay with it anymore." She testified that Allen did not want either her or Defendant to drive because they had both been drinking, but that Defendant had stopped drinking earlier "because he was going to drive back to the hotel, and so he got into the driver's side."
*99 Defendant stated that once Whisman told him she wanted to leave, Defendant told Allen goodbye and got into the driver's seat of Whisman's Jeep, while Whisman got into the front passenger seat. After Defendant started the Jeep, Allen came "storming out," and the mood of the evening, which had up until then been jovial, changed dramatically. Defendant said that Allen was screaming at them and "it was bad." Defendant had the *536 Jeep in reverse, ready to leave, when Allen approached the Jeep and told Defendant to "turn off the f*cking truck." Defendant claimed Allen was "irrational." At this point, Defendant stated that Whisman "started to freak, quite literally."
According to Whisman's testimony, after she said she wanted to leave she got into the passenger side of her Jeep, "[a]nd then [Allen] ... walked over ... and was very angry and was trying to tell [Defendant] not to drive." Whisman testified that Allen yelled something like "where the f*ck do you think you're going." She said that Allen "seemed very agitated that we were leaving" and was yelling at Defendant; Defendant than "got out of [Whisman's] Jeep and tried to calm him down."
Allen testified that he may have told Whisman at some point in time that she was "not going to leave[,]" but that Whisman and Defendant attempted to leave anyway. Allen testified that he was by his porch when he heard the Jeep doors "open," so he "grabbed [his] gun, met them out there." Allen testified that Defendant and Whisman had their guns with them, too. He stated: "Why? I don't know. We just did."[2] Allen testified that it was not Defendant who was in the driver's seat; that it was Whisman who was going to drive Defendant back to the hotel.
Allen testified that he went to the driver's side of Whisman's Jeep, reached into the vehicle, and retrieved the keys. He was not certain "if [he] pulled 'em out of the ignition or if [Defendant] handed 'em to me." Allen testified that he might have asked Whisman "What the f*ck are you doing?" Allen testified he threw Whisman's keys into the woods near his recycling container, whereupon Whisman "freaked out."
Defendant stated that, in response to Allen's behavior, he took the key out of the ignition, exited the Jeep, and tried to talk to Allen and calm him down. Defendant stated that Whisman then got out of the passenger seat, recovered a spare key from a bag in her Jeep, climbed into the driver's seat, and placed the spare key in the ignition.
*100 Whisman testified that she made it clear to Allen that she wanted to leave, but "the more I said it, the more irritated [Allen] got, so I decided to get into the driver seat because I was bound and determined that I was going to leave." Whisman testified that, once she sat down, Allen "pulled me out of the driver seat of my Jeep, lifted me out of the driver seat of my Jeep, threw me up against a tree and was screaming at me" saying "how dare you try to leave." Whisman stated that Allen's hands were "[a]round my shoulders and neck." Whisman testified that she was terrified because she had been in "a situation like that before."
According to Defendant, after he had exited Whisman's Jeep and Whisman had gotten into the driver's seat, Allen "came up, shoved me out of the way, grabbed [Whisman] by the hair, [and] pulled her out onto the ground." Defendant stated that at first, while on the ground, Whisman was laughing, perhaps thinking that Allen was joking around. However, Whisman's laughing "infuriated" Allen, and he grabbed Whisman and "had her up against a tree, hand around her throat, faces nose to nose, asking her if she thought it was a f*cking joke." Defendant stated that at this point Whisman was "hysterical. I'm trying to break them up, but-it might be cowardly-but I knew that he would go off. And, with her in close proximity, that would not be a very good thing." Defendant stated that Whisman "got free" and started "backing away, down towards the pond."
According to Whisman, Defendant "got [Allen] away from me and was trying to calm me down[,]" then she walked around the side of the house while Defendant and Allen were still up at her Jeep. Whisman "just stood around on the side of the house. I was very upset and [Defendant] was calming [Allen] down." She testified that at one point Allen was "crouching and calling me basically like I was his dog, telling me that it was okay, come here, patting his leg."
*537 Allen testified that he did not remove Whisman from her Jeep, that after he threw her keys she got out herself "and she took off screaming." According to Allen, "Whisman jumped out of the Jeep, took off running down ... on the left side of the house. She screamed, 'Sam [Defendant], don't let him do this to me again.' " Allen testified that Whisman ran in back around his house "into the dark[.]" Allen also denied pushing Whisman up against a tree or screaming right in her face once she was out of her Jeep. Allen testified that at that point he disarmed himself by placing his weapon on his chicken coop because " '[o]bviously, for some reason she was afraid of me[,]' " then he moved toward Whisman and "tried to reason with her." However, Allen later testified that, after Whisman ran off, he remained standing by the chicken coop for a minute *101 then walked back to his porch. Allen told police investigators that he disarmed himself because Whisman was "screaming she was afraid for her life." The State introduced photographs of Allen's handgun and magazine on top of his chicken coop, which was positioned between his house and Whisman's Jeep.
Allen testified that Whisman screamed: "Sam [Defendant], don't let him do this to me again" either once or twice, but mainly she was screaming: "Help." Allen testified that he did not know what Whisman meant by: "Sam [Defendant], don't let him do this to me again." Allen denied clapping his hands together and calling for Whisman to come back like he was calling to a dog. Allen testified that Defendant went into the woods to find Whisman, and she eventually stopped screaming.
Defendant stated that he decided to go find Whisman, and he located her near the back of the house. He stated that he was going to walk Whisman to Allen's parent's house, which was nearby, "because I didn't have a vehicle to drive her out of there." Defendant walked Whisman around the house and back to the driveway "to get back to the road" to walk her to Allen's parent's house, but Allen came out and said: "No, you're not going anywhere. You need to go to sleep or we're gonna have a f*cking problem."
Allen testified that while Whisman was in his back yard, and
after I announced that I had unloaded my gun and put it down, she still kept screaming.... I tried to reason with [her]. It had irritated me. [Defendant] had walked around the left side of the house to try to calm [her] down. I walked onto the deck. [ ] Whisman and [Defendant] walked around. I walked back out into the driveway. [Defendant] c[a]me up to the back end of my Jeep there.
Whisman testified that, after she walked beside the house, Defendant came down to where she was standing "and tried to calm me down. He walked me back up towards the front of the house [near] my Jeep. I got back into the passenger side of the Jeep, and [Allen] started screaming at [Defendant] again, and they walked over toward [Allen's] Jeep." Allen testified that he remembered Defendant meeting him at the rear of his Jeep, and remembered telling Defendant to: "Fix your bitch[,]" and "get her under control."
Defendant said Whisman was still hysterical, and Allen told her to "sit down" but she refused. Defendant stated that Allen then said to him "you and I are going to have some words," and that Allen got "in my face, *102 nose to nose, says why are you choosing this bitch over me, etc, etc." Defendant stated that he had his gun in his right-side waistband, so he kept his hands "firmly in [his] pockets" and he "wasn't going to move them." Defendant stated that he did this to be non-threatening, and out of fear that Allen might either take Defendant's gun away from him, or retrieve his own gun from the chicken coop.
Allen testified that he told Defendant: "You need to tell your bitch to shut up." He said he called Whisman a "bitch" twice. Allen testified that Defendant "chest-bumped" him and said " '[d]on't call her a bitch[,]' " so Allen gave Defendant a "right-hook ... to the face[.]" Allen testified that he hit Defendant because Allen was just "trying to help" and Defendant was being "disrespectful" by bumping him in the chest. Allen testified that he was shorter than Defendant, but a physically "bigger guy," and that he knocked Defendant *538 to the ground with "one punch." Allen testified that he turned to walk back to the house but Defendant pushed him in the back, so he turned and "I hit him again," and Defendant "went down."
Defendant stated that once he and Allen were at the rear of Allen's Jeep, Allen "chest pushed" Defendant a few times, and asked him "you want to go [meaning fight with Allen]?" Allen then hit Defendant with a closed fist two times to the left side of Defendant's face. Defendant said his hands remained inside his pockets and he did not retaliate, hoping that Allen would calm down and go inside the house. Defendant stated that Allen was "infuriated at this point[,]" and that Defendant had seen Allen in bar fights and "they're not pretty." Defendant stated about Allen: "I can't match him physically, I just can't." Defendant said that he fell backwards, but not down, in response to Allen's punches.
Whisman testified that Defendant's hands were at his sides when he was talking to Allen, and when Allen punched Defendant. Whisman did not believe Defendant had done anything to provoke Allen, or "make any type of aggressive gesture towards" him. Whisman saw Defendant fall against Allen's Jeep, but did not see Defendant fall to the ground. Whisman further stated that because she was getting out of her Jeep to try and assist Defendant, she did not know if Allen hit Defendant a second time. As Whisman was heading over to the two men, Defendant was not fighting back, and as she got near, Allen turned his attention to her.
Allen testified that, after the second time he hit Defendant, which knocked Defendant back to the ground, Whisman came up to him and said: " 'Don't hit him. Hit me.' " According to Allen, once Whisman approached him, "some words were exchanged," and "I got hit in ... the *103 right side of my head [by Whisman.]" Allen testified that, in response: "I believe I had pushed [Whisman] twice." He testified that first he "gave [Whisman] a little shove to get a little bit of distance between us[,]" but she "stepped back into it" so he stepped toward her and gave her another stronger push with two hands. Allen testified that Defendant was behind him at this time, that after his second push of Whisman, she ended up "in the middle of [a] green patch" in his yard, but that she never fell to the ground.
According to Allen, after the second time he pushed Whisman: "I heard bang bang. All I remember is going down to my knees and then bang again, and that's the round that knocked me over." Allen testified that Defendant screamed Allen's name just before the first shot was fired. Allen testified that the last time he saw Whisman after having been shot, she was standing about fifteen to twenty feet away from him.
According to Defendant, after Allen punched him twice, Whisman was to Defendant's left and Allen then "changed targets" and "went after [Whisman] and had his hand around her throat again and leg-swept her onto the ground." He said this all happened very fast, and he heard a "smack" and Allen had Whisman on the ground. According to Defendant, Allen had "one hand full of [Whisman's] hair," and had his other arm drawn back and ready to strike downwards with a balled fist.
Defendant stated that "at this point [when Allen had Whisman on the ground] I decided that he was going to kill either of us, or at least seriously injure, so I made the split instant decision to defend myself and her." Defendant said he drew his weapon from his waistband, "lined up my sights, I screamed [Allen's] name" at least twice. "When I lined up my shot, because I did not want to hit her, I had his full frontal chest." Defendant stated that he wanted to make sure he did not hit Whisman, but as he fired Allen had turned to "deliver a strike" to Whisman so Allen's "back ended up to me[.]" Defendant stated that he was standing three to seven feet from Allen when he fired, and that his weapon jammed after the third shot.
Whisman testified concerning those final moments:
[Defendant and Allen] were standing by [Allen]'s Jeep and I was watching them, and [Allen] hit [Defendant]. And [Defendant] was leaned up against the side of [Allen's] Jeep, and I got out of my Jeep to step between them. And while I was between *539 them [Allen] was screaming at me, and he pushed me to the ground and I felt my ankle pop. *104 And I buried my face in the ground and covered my head with my arms.
....
[Defendant]'s back was to us when I stepped up between them because he was leaning against the Jeep, and [Allen] was facing [Defendant].
Q. And you said that [Allen] shoved you, is that correct, of what happened next?
A. Yes.
Q. And with one hand, with two hands? How did he shove you?
A. I believe he grabbed my shoulder and threw me to the ground.
Q. And you said that you then fell to the ground and put your hands over your head; is that correct?
A. Yes.
Q. And what happened next?
A. I was really afraid that he was going to-he was going to kill me, so I stayed in that position. And then I heard three rapid fired shots and I stood up and I thought it was me that was shot. And I looked behind me and [Allen] was on the ground calling Doc, Doc,[3] I've been hit; I can't feel my legs.
Whisman testified that, when Allen threw her to the ground, she landed so hard that her "glasses came off[,]" then Allen "came towards" her. Whisman stated that she covered her head because she "thought [Allen] was going to kick my face in." Whisman testified that she could not remember for certain if Allen was touching her when she heard the shots, but she did not believe he was. Whisman stated that the last thing she remembered seeing before the shots were fired was Allen "over the top of me." Whisman testified that she did not believe Allen would have stopped attacking her if Defendant had not intervened.
Defendant stated that, after the shooting, the "air [was let] out of the balloon. He was my friend again." Defendant was not certain Allen was *105 not a continuing threat, so he grabbed Whisman's arm and pulled her away to a safe distance, then called 911. Defendant said that Allen was crying, asked him to call 911, and asked Defendant to give him a hug. Defendant stated that he placed his weapon on the ground and went to Allen, found his wounds, and started administering first aid, which he continued doing until police arrived and took over.
Allen testified that he could not remember asking Defendant to "[g]ive me a hug" after he was shot, but that he did not doubt that he had said it. Whisman testified that, after the shooting, Defendant called 911 and told her to "go inside and get his med bag." Defendant then administered aid to Allen until the police arrived.
When Mint Hill Police Officer Joshua Kelly ("Officer Kelly") arrived at the scene of the shooting with two other officers, he first saw Defendant "administering first aid" to Allen. Defendant alerted Officer Kelly to the presence of his handgun seven to ten feet away by pointing and saying: " 'The weapon is over there.' " Defendant also pointed out where another handgun was located, and informed the officers that that weapon had not been fired. Officer Kelly testified that, after Defendant was arrested, he transported Defendant to jail, and that Defendant was not showing obvious signs of impairment.
Allen was taken to the hospital, where he remained for a "month and a half." The bullets remained in Allen's body, and he remained wheelchair-bound at the time of trial, unable to walk, with a diagnosis of permanent partial paralysis.
Mint Hill Police Detective Keith A. Mickovic ("Detective Mickovic") interviewed Defendant at the police department just before midnight on 28 July 2014. Defendant signed a waiver of his Miranda rights. Detective Mickovic testified, that after his nearly two hour interview with Defendant, he did not believe Defendant to be "in the least" intoxicated.
B. Pre-Trial Motions, Deposition of Whisman
Relevant to this appeal, Defendant notified the State that he would be pursuing a claim *540 of defense of others. The State filed a "Motion to Depose Witness Prior to Trial" on 25 February 2015, claiming that Whisman was "an essential witness," that the "State intends to call the above-captioned matter for trial the week of June 14, 2015," and that Whisman would be "unavailable" to attend trial at that time because she was currently under orders of deployment lasting from 19 February 2015 until 31 December 2015. Arguing that the trial court "has the inherent authority 'to do all things that are reasonably necessary for the proper *106 administration of justice' and [ ] Whisman's testimony is essential for the proper administration of justice in the above-captioned case[,]" the State requested that "the certified transcript and/or video of the deposition ... be admissible at trial in lieu of [ ] Whisman's live testimony, pursuant to NCGS § 804(b)(1), as well as NCGS § 8-85." In anticipation of Defendant's request that the trial be continued until Whisman's deployment ended, the State argued that her "currently-scheduled and past international deployments suggest that, even if the State were to wait until she returns from her currently-scheduled deployment, she will always be in danger of being deployed overseas yet again."
Defendant responded to the State's 25 February 2015 motion on 27 February 2015, opposing the request to allow a pre-trial video deposition of Whisman's testimony, and opposing being deprived of the right to confront Whisman in person at trial. Defendant argued that the 14 June 2015 date was the first time the matter had been scheduled for trial, that Defendant "would consent to a continuance of the trial until such time that Whisman is available[,]" and that Defendant "would further waive any speedy trial rights if the matter were continued." Defendant further argued that since Whisman had already been deployed-beginning 19 February 2015-having her return to North Carolina during deployment for a deposition would not be any different than having her return for trial. Defendant argued that "the State does not have the authority to conduct pretrial depositions of witnesses" without Defendant's consent, citing our Supreme Court's opinion in State v. Hartsfield .[4] Defendant disputed the State's assertion that the trial court's "inherent authority 'to do all things that are reasonably necessary for the proper administration of justice' would ... extend to allow the prosecution to take a deposition of one of its witnesses when resetting the trial date would resolve the *107 issue." Defendant finally argued that to deprive him of his right to question Whisman in front of the jury, when she could be made available, violated his Sixth Amendment rights as guaranteed by the Confrontation Clause, as well as the corresponding rights guaranteed him by the North Carolina Constitution.
Judge W. Robert Bell heard the State's motion on 4 March 2015, and entered an order 9 March 2015. At the hearing, the State stated: "I don't see how the state can get this case done without having [Whisman] here." The trial court ruled that because Whisman would likely be deployed out of the country "[b]eginning in early April 2015 ... until December 2015[,]" and because she would, after that date, remain "in danger of being deployed overseas again[,]" Whisman should be deposed the week of March 23 in case "she is 'unavailable' according to NCGS § 8C-1, Rule 804(a)(5) when the matter is called for trial."
*541 Whisman was subpoenaed, returned to North Carolina from Camp Pendleton, in California, and was deposed 23 March 2015 in the presence of Judge Carl Fox. Defendant again objected to the taking of Whisman's deposition. Following the deposition, the following discussion occurred:
[THE STATE]: Your Honor, at this time the State would ask this hearing be terminated and ask that [ ] Whisman be allowed to go back to serving our country.
THE COURT: All right. Do you have any objection to releasing the witness?
[DEFENDANT'S COUNSEL]: Well, we would in light of our objections to this proceeding. If she's under a subpoena we would ask that she not be released from her subpoena . [Emphasis added].
THE COURT: Well, you do agree that this terminates the deposition, though.
[DEFENDANT'S COUNSEL]: This terminates this proceeding, yes, Your Honor.
THE COURT: All right. Then the Court notes the defendant's objection and the witness is released from her subpoena to go.
[THE STATE]: Thank you, Your Honor.
The State filed "Notice of Intention to Admit Prior Testimony" on 22 May 2015, "because the State anticipate[d] Whisman being 'unavailable'
*108 for trial[.]" Ten days after filing this notice, 1 June 2015, the State apparently deposited a subpoena in the mail, destination Darwin, Australia, demanding Whisman's appearance at trial. This matter came to trial on 15 June 2015, in front of Judge Jeffrey P. Hunt. The State filed a "Motion in Limine " that same day moving the trial court "to allow the State to introduce the transcript and/or video recording from former testimony of [Whisman], an unavailable yet critical witness, during trial pursuant to N.C.G.S. § 8C-1, Rule 804(b)(1)."
C. Trial
The State's motion in limine was heard the morning of 15 June 2015, the first day of Defendant's trial. The State did not argue any basis in support of its motion beyond that contained in its written motion. Defendant again objected, reiterating his belief that the State had no authority to depose its witness prior to trial without Defendant's consent, that "[a]s far as her unavailability, my understanding is that, if the request was made to her command to have her come, they would make arrangements[,]" that Defendant had objected to Whisman being released from subpoena after her deposition, but "she was released and we're here today[,]" and that "[a]ll we had to do was continue the trial ... and she would be here." The trial court granted the State's motion based upon the following relevant findings:
I'm going to enter the following order. That the matter came up on motion of the State to use-I believe it's 804. Is that the rule-to use 804, testimony in the form of a video of a-of an indispensable witness who's in the military. The Court heard argument of both sides regarding the availability or unavailability of said witness. The Court finds the witness is in the military and is stationed outside of the State of North Carolina currently. May be in Australia or whereabouts may be unknown as far as where she's stationed.
Based on these findings, the trial court ruled that Whisman was unavailable, and that Defendant's confrontation rights would not be violated by allowing the video of Whisman's deposition to be entered into evidence in lieu of her live testimony before the jury. Whisman did not appear at trial, and her video deposition testimony was entered into evidence in lieu of her live testimony. The evidentiary portion of Defendant's trial concluded on 18 June 2015.
Closing arguments were delivered on 19 June 2015. In its closing argument, the State focused primarily on the following evidence. Allen *109 was unarmed when Defendant shot him three times in the back, that "the crux of this entire case [was] did [Defendant] use excessive force" in response to Allen's actions, thus negating any claim of defense of other. The State argued: "Three shots to the back of an unarmed man who [D]efendant knew to be unarmed, excessive force." The State argued that, even if the jury believed Defendant's first shot was reasonable, the second and third shot were clearly excessive. The State argued that Defendant gave conflicting statements during his interview with Detective *542 Mickovic concerning the moments right before he shot Allen. Specifically, the State argued that Defendant first said Allen had a handful of Whisman's hair, then that Allen was standing over Whisman when he was shot, and finally, that in his written statement Defendant said Allen had his hands around Whisman's throat.
The State conceded certain evidence from Whisman and Defendant, and thereby acknowledged that Allen had not been completely truthful in his own testimony. Specifically, the State argued:
[W]e know when the ruckus started near [Whisman]'s Jeep, both [Whisman] and [D]efendant tell us that ... Allen had [Whisman] up against the tree briefly. [D]efendant said that [Allen] had her by the throat. [Whisman] said it was sort of the shoulder/neck area. [ ] Allen did not say this happened, but, again, the two of them pretty quickly after this happened said that that's what happened, so I think you could reasonably assume that there was something like that going on.
The State informed the jury that it generally believed Whisman to be a credible witness. The State then went on to explain why it believed Whisman was screaming: "Sam [Defendant], don't let him do this to me again."
Also on the stand, pretty significant, clearly she'd been through something like this. Remember, [ ] Allen testified he heard her saying, "Don't let him do this to me again." There's no dispute [ ] Allen had never met [ ] Whisman before. They had never met once. They talked on the phone maybe a couple times, if even that. So she was clearly going somewhere in her own mind that was not having anything to do with [ ] Allen. We know that. (Emphasis added).
The State argued that Whisman was not pleading with Defendant to prevent Allen from assaulting her again, but was reliving some incident in her past that made her unreasonably fearful that evening.
*110 The State told the jury to focus on Defendant's intent, arguing: "You don't get to empty a weapon or attempt to empty a weapon in someone's back and say you weren't trying to kill them." The State focused on the elements of defense of another-whether it was "reasonable" for Defendant "to perceive this kind of harm based on the fact that [Allen] had touched [Whisman] three times[,]" and whether Defendant actually felt that Whisman was in imminent danger of death or great bodily harm. The State's theory on Defendant's motive to shoot Allen was revenge: "[W]as he really thinking I just got punched twice in the face and now I've got my chance? Because remember, right before he shot [ ] Allen he'd been punched twice in the face. Didn't hit back." The State further argued that firing three shots at Allen constituted excessive force and, therefore, prevented Defendant from being able to rely on defense of another.
In Defendant's closing, he focused on the testimony of Whisman, Defendant, Officer Kelly, and Detective Mickovic that Defendant was not intoxicated the night of 28 July 2014. "[Defendant] and [Whisman] go to the Jeep and [Defendant] is going to drive because he had stopped drinking and he says that and the officers said that he was sober. He was using common sense. That makes sense, he's the designated driver. His car is back at the hotel." Defendant focused on the fact that Allen's own rules were that you did not mess with guns when you'd been drinking, but that when Allen went out to confront Defendant and Whisman about leaving, he picked up his handgun and brought it with him. Defendant contended that, after Allen pulled Whisman out of her Jeep and onto the ground, she laughed, and this angered Allen, who then "takes her and puts her up against that tree and she freaks out." That once Defendant came to assist her, Whisman ran "into the night, the woods, and she's screaming, 'Don't let him do this to me again.' " Defendant recalled Allen's testimony that he didn't know what Whisman meant by "don't let him do this to me again," but suggests: "let's use our common sense. [Allen] pulls [Whisman] out of the car and puts her up against a tree. Maybe don't let [Allen] attack me again, does that make sense?"
Defendant argued that Defendant tried to remove Whisman from the scene, and thus end the altercation, but when they came around the other side of the house, Whisman *543 "starts to scream again because [Allen] is waiting for them because he wants to stop them[.]" Defendant further argued:
Some things everyone agreed on, [Allen] hit [Defendant], either they had chest-bumped or [Defendant] was like this trying to reason with his brother. [Whisman] comes to *111 help [Defendant] because she's not going to sit there and watch her friend get hit. And [Allen] turns his attention to her, and he pushes her once according to her testimony, maybe twice according to [Allen], twice according to [Defendant], and she ends up on the ground. She is covering her head because she's afraid of what he is going to do. This man that she has never met has changed. Everything was fine until it's time to go. He assaults her when he pulls her from the Jeep and assaults her when he puts her up against the tree, and now it's even more vicious because he has punched and put [Defendant] on the ground and now it's her turn. The violence is escalating. And before he can inflict gross bodily injury, before he can kick her face and before he can kill her [Defendant] shoots three times.
Following the closing arguments, the trial court instructed the jury, inter alia , on assault with a deadly weapon with intent to kill inflicting serious injury, and on the lesser included offense of assault with a deadly weapon inflicting serious injury. Concerning the "intent to kill" element of assault with a deadly weapon with intent to kill inflicting serious injury,[5] the trial court instructed the jury: "The State must prove that [D]efendant had the specific intent to kill the victim." "You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom." The trial court also instructed the jury on defense of another:[6]
[You must] also consider whether [D]efendant's actions are excused and [D]efendant is not guilty because [D]efendant acted in defense of a third person. The State has the burden of proving from the evidence beyond a reasonable doubt that [D]efendant's action was not in defense of a third person. If the circumstances would have created a reasonable belief in the mind of a person of ordinary firmness that the assault was necessary or reasonably appeared to be necessary to protect a third person from imminent death or great bodily harm and the circumstances did reasonably create such a belief in [D]efendant's *112 mind at the time [D]efendant acted, such assault would be justified-such assault would be justified by defense of a third person. You the jury determine the reasonableness of [D]efendant's belief from the circumstances appearing to [D]efendant at the time.
Now, a defendant does not have the right to use excessive force. [D]efendant had the right to use only such force as reasonably appeared necessary to [D]efendant under the circumstances to protect a third person from death or great bodily harm. In making this determination, you should consider the circumstances as you find them to have existed from the evidence, including the size, age and strength of [D]efendant and the third person as compared to the victim , the fierceness of the assault, if any, upon the third person , whether the victim had a weapon in the victim's possession and the reputation, if any, of the victim for danger and violence . (Emphasis added).
The jury found Defendant guilty of assault with a deadly weapon with intent to kill inflicting serious injury on 19 June 2015. Defendant filed a motion for appropriate relief ("MAR") on 29 June 2015, then filed an amended MAR on 15 December 2015, arguing that "the trial court erred by permitting the State to introduce a video deposition of a witness rather than calling that witness live at trial" in violation of Defendant's rights under the North Carolina and United States Constitutions, that the trial court erred by *544 failing to instruct the jury on the doctrine of imperfect self-defense, and that there was insufficient evidence to have convicted Defendant. The trial court denied Defendant's MAR by order entered 29 February 2016. Defendant appeals.
II. Analysis
A. Whisman's "Unavailability"
In Defendant's first argument, he contends the trial court erred by finding Whisman "unavailable" for the purposes of N.C. Gen. Stat. § 8C-1, Rule 804(a)(5), and allowing her deposition testimony to be presented instead of requiring her live testimony at trial. Defendant further argues that depriving him of his right to confront Whisman in front of the jury violated the Confrontation Clause of the Sixth Amendment of the United States Constitution, as well as his rights under Article I, Sections 19 and 23, of the North Carolina Constitution. Defendant also contends that the *113 trial court erred in denying that portion of his amended MAR based upon the above arguments. We agree.
1. Standards of review
Rule 804 of the North Carolina Rules of Evidence allows prior testimony of a witness to be introduced at trial in lieu of the live testimony of that witness in certain circumstances, including:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(1) Former Testimony.-Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
N.C. Gen. Stat. § 8C-1, Rule 804(b) (2015). Our Supreme Court has discussed how Rule 804 limits when a witness may be declared "unavailable," and the State relied upon the following condition-(5)-to argue Whisman was unavailable:
Under the Rules of Evidence, a witness is considered "unavailable" when that witness:
....
(5) Is absent from the hearing and the proponent of [her] statement has been unable to procure [her] attendance ... by process or other reasonable means.
N.C.G.S. § 8C-1, Rule 804(a). Before a trial court may admit hearsay testimony under Rule 804(b), it must find that at least one of the conditions listed in Rule 804(a) has been satisfied .
State v. Nobles , 357 N.C. 433, 439-40, 584 S.E.2d 765, 771 (2003) (citation omitted) (emphasis added). In the present case, although the State argued that Whisman was unavailable pursuant to Rule 804(a)(5), the trial court made no such finding in its order, merely stating: "That the matter came up on motion of the State to use-I believe it's 804. Is that the rule-to use 804, testimony in the form of a video of a-of an indispensable witness who's in the military."
*114 In order for a trial court to find a witness "unavailable" for the purposes of the Confrontation Clause:
"the possibility of a refusal [by the witness] is not the equivalent of asking and receiving a rebuff." In short, a witness is not "unavailable" for purposes of the foregoing exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain [her] presence at trial.
Barber v. Page , 390 U.S. 719, 724-25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255, 260 (1968) (citation omitted).
The State contends that "it is unclear what standard of review applies to a trial court's ruling that a witness is unavailable." The State cites two cases from our Supreme Court to highlight this uncertainty: State v. Fowler , 353 N.C. 599, 548 S.E.2d 684 (2001), and State v. Bowie , 340 N.C. 199, 456 S.E.2d 771 (1995). To the extent, if any, that these two opinions are in conflict, Fowler , as the most recent pronouncement from our Supreme Court, controls. In Fowler , the defendant was contesting the admission of a witness' out-of-court statements based upon *545 N.C. Gen. Stat. § Rule 804, Article I, Section 23 of the North Carolina Constitution, and the Confrontation Clause. Fowler , 353 N.C. at 607, 548 S.E.2d at 692.
The Court in Fowler consistently analyzed whether the trial court's findings of fact related to the witness' unavailability were supported by the evidence and, in turn, supported its conclusions of law. Fowler , 353 N.C. at 610, 548 S.E.2d at 693 ("The trial court's detailed findings of fact are sufficient to support its conclusion that [the witness] was unavailable."); Id . at 614, 548 S.E.2d at 695-96 ("Contrary to defendant's contention, the trial court's findings support a conclusion that the state acted diligently in trying to produce [the witness] to testify..... The trial court made the following findings of fact to support its conclusion: (1) state officials contacted [the witness] in India, and [the witness] informed them there was no way he would return to the United States to testify; (2) [the witness] was not willing to return to this country because his painful injuries made travel difficult and he feared for his safety; (3) the state spoke numerous times with [the witness]'s brother in California in attempts to locate [the witness]; (4) the state offered to provide [the witness] with police protection during his stay; and (5) the state offered to pay for [the witness]'s airfare, lodging, meals, and care for his injuries during his stay. These facts are sufficient to support the trial court's conclusion that the state's efforts to produce [the witness] were diligent.").
*115 The requirement that the trial court enter sufficient findings of fact to support its conclusion of unavailability is further established by State v. Triplett :
The degree of detail required in the finding of unavailability will depend on the circumstances of the particular case. For example, in the present case, the declarant is dead. The trial judge's determination of unavailability in such cases must be supported by a finding that the declarant is dead, which finding in turn must be supported by evidence of death. Situations involving out-of-state or ill declarants or declarants invoking their fifth amendment right against self-incrimination may require a greater degree of detail in the findings of fact.
State v. Triplett , 316 N.C. 1, 8, 340 S.E.2d 736, 740-41 (1986) (citation omitted) (emphasis added). "Before a trial court may admit hearsay testimony under Rule 804(b), it must find that at least one of the conditions listed in Rule 804(a) has been satisfied. The proponent of the statement bears the burden of satisfying the requirements of unavailability under Rule 804(a)." Nobles , 357 N.C. at 440, 584 S.E.2d at 771 (citations omitted). The trial court was required to make sufficient findings of fact, based upon competent evidence, in support of any ruling that the State had satisfied its burden of demonstrating that it had "been unable to procure [Whisman's] attendance ... by process or other reasonable means" for the purposes of N.C. Gen. Stat. § 8C-1, Rule 804(a)(5), and that it had "made a good-faith effort to obtain [her] presence at trial" for Confrontation Clause purposes. Barber , 390 U.S. at 725, 88 S.Ct. at 1322, 20 L.Ed.2d at 260.
2. Inadequate Findings of Fact
In the present case, the entirety of the trial court's findings of fact related to the State's burden to prove Whisman's unavailability at trial were as follows:[7] "The [trial court] finds [Whisman] is in the military and is stationed outside of the State of North Carolina currently. May be in Australia or whereabouts may be unknown as far as where she's stationed." The trial court's findings were sufficient to demonstrate that Whisman was "absent from the hearing[.]" N.C. Gen. Stat. § 8C-1, Rule 804(a)(5). However, the trial court made no findings that would support more than mere inference that the State "ha[d] been unable to procure *116 [her] attendance ... by process or other reasonable means." Id . The trial court made no findings concerning any efforts made by the State to procure Whisman's presence at trial, nor any findings demonstrating the necessity *546 of proceeding to trial without Whisman's live testimony. See Fowler , 353 N.C. at 614, 548 S.E.2d at 695-96. The trial court did not address the option of continuing trial until Whisman returned from her deployment, nor did it make any finding that the State "made a good-faith effort to obtain [Whisman's] presence at trial[,]" much less any findings demonstrating what actions taken by the State could constitute good-faith efforts. Barber , 390 U.S. at 724-25, 88 S.Ct. at 1322, 20 L.Ed.2d at 260.
Although the State places much focus on findings made by different judges at earlier hearings, it was the duty of the judge who heard the State's 15 June 2015 motion in limine to make all relevant and necessary findings and conclusions in support of its ruling that Whisman was "unavailable" for the purposes of Rule 804 and the Confrontation Clause, and that admission of her deposition testimony without her being present was therefore proper. The trial court's 15 June 2015 ruling failed to include the necessary findings of fact, and we therefore hold that it was error to grant the State's motion to admit Whisman's deposition testimony in lieu of her live testimony at trial. For this same reason, it was error for the trial court to deny Claim 1 of Defendant's amended MAR-that the trial court erred "by permitting the State to introduce a video deposition of a witness rather than calling that witness[.]"
3. Inadequate Evidence of "Unavailability"
Even assuming, arguendo , the trial court's findings of fact and conclusions had been sufficient to support its ruling, we further hold that the evidence presented to the trial court was insufficient to support an ultimate finding of "unavailability."
a. Subpoena
The State filed a motion in limine on 15 June 2015, requesting the trial court allow the video of Whisman's deposition be entered into evidence and presented at trial in lieu of in-person testimony by Whisman, and the motion was heard on that date. In this motion, the State argued the following evidence relevant to Whisman's alleged "unavailability:"
8) [ ] Whisman is currently enlisted in the United States Navy as a Corpsman.
9) Pursuant to [ ] Whisman's obligations in service to our nation, she is currently assigned to provide naval support *117 to a United States Marine Corps mission. See Exhibit A for a copy of [ ] Whisman's military orders.
10) Since April 2015, [ ] Whisman has been deployed out of the country, and she is not scheduled to return until December 2015.
11) Due to the potential threat to national security associated with revealing such information, the United States Navy, in communications with the undersigned Assistant District Attorney (see Exhibit B ) has indicated that it will not disclose [ ] Whisman's whereabouts.
12) The undersigned Assistant District Attorney was provided with a mailing address to send a subpoena to [ ]
Whisman, which was sent via registered mail (see Exhibit C ).
Exhibit C includes a copy of an undelivered subpoena signed on 28 May 2015 by an Assistant District Attorney. The addresses included on the subpoena are what appear to be Whisman's California street address, and an address for a Marine base in Australia: "Marine Rotational Forces [sic] Darwin, 1st BN, 4th Marines, Unit 10126, FPO AE[8] 96610-0126." The presence of this address on the subpoena suggests that, contrary to the State's assertions in its motions and at trial, the Navy had not "indicated that it would not disclose [ ] Whisman's whereabouts," at least relative to the location of her overseas command.
Further, in both the 18 February 2015 and the 20 May 2015 letters from the Marine Corps indicating that Whisman would be deployed overseas and that the Marines might not be forthcoming with Whisman's particular location at any specific time, the State was provided with a singular phone number *547 for two personnel who were each identified as "[t]he point of contact for this matter[.]"[9] There is no record evidence that the State contacted either of these people.
The sole attempt to obtain Whisman's attendance at trial appearing in the record was the "Exhibit C" subpoena apparently sent to Darwin, Australia shortly before trial. Further included in Exhibit C is a receipt for "certified mail" postmarked 1 June 2015, and an undated webpage printout from USPS.com indicating that the certified mail postmarked 1 June 2015 arrived at a Postal Service facility in Chicago in the *118 afternoon of 5 June 2015, and that "[t]he item is currently in transit to the destination."[10]
The included certified mail receipt indicates that $2.80 was paid for "Return Receipt (hardcopy)," though the appropriate box was not checked. Further, the space on the receipt for the "Sent To" address was left blank. In a box marked "Official Use" was included "FPO AP 96610[.]" This "Official Use" entry is the only indication that the certified mail receipt is connected with the subpoena. From the record it appears that only one subpoena was sent. The "Official Use" entry of "FPO AP 96610" would seem to indicate that the single piece of certified mail was sent to Marine Rotational Force Darwin. Though "Return Receipt (hardcopy)" was apparently paid for, no return receipt is included in the record, suggesting the certified mail was never delivered. There is no indication of when the USPS.com tracking webpage printout was obtained. If the State obtained this tracking information right before the 15 June 2015 hearing, then the subpoena had not even reached Australia by that time. What is certain is that the subpoena-assuming that was what was included in the certified mail-was still in the United States on 5 June 2015 for a trial that was scheduled to begin the week of 14 June 2015, and which in fact commenced 15 June 2015. The State produced no evidence that its subpoena reached its destination, much less that it reached its destination in time to have been meaningful.[11]
b. Code of Federal Regulations
We take judicial notice that rules concerning requests for the return of naval service members to the United States, and the service of process on members of the Navy are set forth in the Code of Federal Regulations ("the Code"), specifically 32 CFR "Part 720-Delivery of Personnel; Service of Process and Subpoenas; Production of Official Records." Subpart D of Part 720 states in relevant part: "This instruction: Establishes policy and procedures for requesting the return to the United States of, or other action affecting, Department of the Navy (DON) personnel ... serving outside the United States ... in compliance with court orders." 32 C.F.R. § 720.40(b). Request for return is defined as: "Any request or order received from a court, or from federal, state or local authorities concerning a court order, for the return to the United States of members ... for any reason listed in § 720.42."
*119 32 C.F.R. § 720.41. There is nothing in Subpart D indicating that a subpoena is required for initiating a request for return.
32 C.F.R. § 720.42 states that "[i]t is Department of the Navy policy to cooperate, as prescribed in this instruction, with courts and federal, state and local officials in enforcing court orders. 32 C.F.R. § 720.42(a).[12] The Code further identifies the "responsible officials" authorized to respond to requests for *548 the return of members. 32 C.F.R. § 720.42(g), 32 C.F.R. § 720.44. Contact information is given for these responsible officials in 32 C.F.R. § 720.43(a), and this section also provides a place to send requests when the appropriate responsible official is uncertain. 32 C.F.R. § 720.43(b). There is no record evidence that the State attempted to obtain the presence of Whisman at trial through the procedures laid out in Subpart D of 32 C.F.R. § 720, though Subpart D would appear to offer "other reasonable means" of attempting to procure Whisman for trial as authorized in Rule 804(a)(5).
The Code also specifically addresses the method for subpoenaing members to appear as witnesses in State courts:
Where members ... are subpoenaed to appear as witnesses in State courts, and are served as described in §[ ] 720.20, 720.20(d) applies..... If State authorities are attempting to obtain the presence of a member ... as a witness in a civil or criminal case, and such person is unavailable because of an overseas assignment, the command should immediately contact the Judge Advocate General [.]
32 C.F.R. § 720.21 (emphasis added). The Code does contemplate service on out-of-state members by mail:
Out-of-State process. In those cases where the process is to be served by authority of a jurisdiction other than that where the command is located, the person named is not required to accept process..... If service of process *120 is attempted from out-of-State by mail and refused, the refusal should be noted and the documents returned to the sender. Questions should be referred to the staff judge advocate, command counsel, or the local naval legal service office.
32 C.F.R. § 720.20(a)(2) (emphasis added). In general, the following rules apply for serving subpoenas: "Commanding officers afloat and ashore may permit service of process of ... State courts upon members ... residing at or located on a naval installation, if located within their commands." 32 C.F.R. § 720.20(a). There is no record evidence that the subpoena mailed to Australia on 1 June 2015 was addressed to the attention of the appropriate commanding officer, the Judge Advocate General, or any other individual that was authorized by the Code to facilitate service of the subpoena or grant any request that Whisman be returned to North Carolina to testify.
When service of process is effectuated, the commanding officer will normally try and facilitate compliance:
When members ... are either served with process, or voluntarily accept service of process ... the commanding officer normally will grant leave or liberty to the person served to permit compliance with the process, unless to do so would have an adverse impact on naval operations ..... When it would be in the best interests of the United States Government (for example, in State criminal trials), travel funds may be used to provide members ... as witnesses[.]
32 C.F.R. § 720.20(d) (emphasis added). If service is not permitted, or if the served member is not allowed leave in response to the subpoena, "a report of such refusal and the reasons therefor shall be made ... to the Judge Advocate General[.]" 32 C.F.R. § 720.20(e).
It is unclear what method was used by the State to subpoena Whisman while she was still in California, but it is clear that the appropriate authorities cooperated in order that Whisman could attend the 23 March 2015 deposition. However, there is no record evidence that the State attempted any timely subpoena of Whisman for the 15 June 2015 trial date, nor that it complied with the Code in its attempted method of service. Had the State's subpoena by certified mail reached the proper authorities, they would have been required under the Code to respond; either by facilitating Whisman's return to North Carolina to testify at trial, or by refusing service and returning the subpoena to the State with *121 notification that service was rejected. 32 C.F.R. § 720.20(a)(2). Relying on the record evidence, neither of these outcomes occurred, which suggests that the State's improper method of service either prevented the subpoena from reaching a proper authority, or delayed service until there was no possibility for Whisman to *549 make the trip from Australia to North Carolina by 15 June 2015.
In its 15 June 2015 motion, the State provided the following additional rationale for why the trial court should find that Whisman was "unavailable" for the purposes of Rule 804(b)(1) and the Confrontation Clause:
In the present case, the State received information from the United States Navy that [ ] Whisman would be deployed out of the country at the time of trial. Further, [ ] Whisman's prior history of foreign deployment (e.g., Guantanamo Bay, Cuba) suggested that even if the State were to wait for her to return to the country before calling the matter for trial, she could be deployed again. With these things in mind, the State flew [ ] Whisman to Charlotte from California to be deposed, all at the State's expense, the week before she was scheduled to be shipped out of the country. Since the deposition, the State has been in contact with officials from the United States Navy, who have confirmed that [ ] Whisman is deployed and that her whereabouts constitute a matter of national security.[13]
....
Given that the Defendant was present at the deposition and represented by counsel with the opportunity to cross-examine [ ] Whisman, the Defendant's Constitutional rights were protected. Cf., e.g., State v. Ross, 216 N.C.App. 337, 720 S.E.2d 403 (2011) (no violation of Confrontation Clause at trial when court admitted testimony from probable cause hearing, because such hearing provided adequate prior opportunity to cross-examine).
At the 15 June 2015 motion hearing, the State made the following oral argument:
Since [Whisman's deposition] the State has received further confirmation as indicated in that motion that she is *122 not available. The military has indicated as a matter of national security they will not disclose where she is. I don't know how to get her here. We have made very good effort, Your Honor, flying her out here to testify in the first place. I couldn't tell you where she is now. I've provided documentation from the United States Navy indicating as such. So would ask that you declare her unavailable and admit her prior testimony under the former testimony exception to the hearsay rule.
Based upon the above, the State's relevant evidence in support of Whisman's alleged unavailability was as follows: that she would be serving overseas as a Navy corpsman until December 2015; that her whereabouts were currently unknown, but that the State had been provided "with a mailing address to send a subpoena to [her;]" that the State had sent a subpoena, presumably to the mailing address provided, approximately two weeks before the time Whisman was required for trial; and that there had been no response from Whisman. Record evidence strongly suggests that the subpoena never reached Whisman. Although the State mainly focused its argument on evidence related to the effort it took to subpoena and procure Whisman for the 23 March 2015 deposition , none of that evidence is relevant to our "unavailability" analysis, which is entirely limited to whether she could be produced at trial .
Defendant responded to the State's argument as follows:
Your Honor, at this time we would renew our objections, first to even the taking of the deposition. We contend that it was an abuse of Judge Bell's power in violation of the defendant's rights under the United States and North Carolina Constitution, Fifth, Sixth and Fourteenth Amendments, to even take. All we had to do was continue the trial until October[14] and she would be here .
As far as her unavailability, my understanding is that, if the request was made to her command to have her come, they would make arrangements . She is in Australia according to her Facebook page, you *550 know, so, again, we understand that she's not here. At the end of the videotaped deposition the State asked for her to be released, we objected to that, she was released and we're here today .
*123 The Code supports Defendant's assertion that the policy of the Navy and Marine Corps is to help facilitate the availability of its members to testify in criminal proceedings when possible. 32 C.F.R. § 720.20.
Further, the trial court's refusal to continue the trial to a date subsequent to Whisman's return from Australia, and the State's request that the trial court deny Defendant's motion to continue, is an important factor to be considered in our "unavailability" analysis. Our analysis is not confined to whether Whisman was unavailable for trial on the specific date of 15 June 2015, but whether Whisman was unavailable to testify at Defendant's trial, whenever that trial might have taken place, considering all relevant factors, rights, and policy considerations.
However, the trial court ruled that Whisman was "unavailable" for Rule 804 and Confrontation Clause purposes, and allowed Whisman's deposition testimony in lieu of her live testimony at trial, based entirely upon the following findings of fact: "The Court finds the witness is in the military and is stationed outside of the State of North Carolina currently. May be in Australia or whereabouts may be unknown as far as where she's stationed."
c. Rule 804
We hold that even had the trial court made findings and conclusions supporting that the State "has been unable to procure [her] attendance ... by process or other reasonable means[,]" as required by N.C. Gen. Stat. § 8C-1, Rule 804(a)(5), the record evidence would not support this conclusion. The State could have requested that its original subpoena of Whisman remain in place until trial, or it could have served her with a new subpoena when she was in North Carolina for the 23 March 2015 deposition, but it did not do so. See N.C. Gen. Stat. § 8-63 (2015) ("Every witness, being summoned to appear in any of the said courts ... shall appear accordingly, and ... continue to attend from session to session until discharged, ... when summoned in a criminal prosecution, until discharged by the court, the prosecuting officer, or the party at whose instance he was summoned[.]"); N.C. Gen. Stat. § 8-59 (2015) ("In obtaining the testimony of witnesses in causes pending in the trial divisions of the General Court of Justice, subpoenas shall be issued and served in the manner provided in Rule 45 of the Rules of Civil Procedure for civil actions. Provided that in criminal cases any employee of a local law-enforcement agency may effect service of a subpoena for the attendance of witnesses by telephone communication with the person named.").
Instead, the State made a direct request that the trial court release Whisman from its subpoena, and instead apparently mailed a subpoena, *124 addressed to no one,[15] to Marine Rotational Force Darwin, in Australia, two weeks before the start of trial. This subpoena was still in the United States ten days before trial, and there is no record evidence that it ever reached its destination. Further, the State could have either suggested a continuation of the trial until after Whisman's deployment ended, or at least not objected to Defendant's repeated requests to continue the trial so Whisman could testify in person. The State articulated no compelling reason in support of its objection to a continuance, nor did the trial court justify the necessity for denying a continuance. We are unable to find any compelling reason why the trial could not have been continued until after Whisman's return from deployment.
We do not find the efforts of the State to effectuate Whisman's appearance at trial to have been reasonable or made in good faith, as there is almost no possibility that the subpoena could have reached Whisman in time for her command to have granted her leave to respond; the State had ample opportunity to maintain or effectuate service in March 2015; and there were other methods available to the State to try and obtain Whisman's presence at trial that it did not pursue. See *551 Nobles , 357 N.C. at 437-38, 584 S.E.2d at 770. The evidence presented by the State was insufficient to sustain an ultimate finding that it had "been unable to procure [Whisman's] attendance ... by process or other reasonable means[,]" N.C. Gen. Stat. § 8C-1, Rule 804(a)(5) and, in fact, no such finding was made . For this alternate reason, we also hold that the trial court erred in admitting Whisman's deposition testimony in lieu of her live testimony at trial.
d. Confrontation Clause
Defendant also argues that allowing Whisman's deposition testimony in lieu of her live testimony at trial violated the Confrontation Clause of the Sixth Amendment of the United States Constitution. We agree.
The United States Supreme Court has stated: "We observed in Coy v. Iowa [ 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) ] that 'the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact .' " Maryland v. Craig , 497 U.S. 836, 844, 110 S.Ct. 3157, 3162, 111 L.Ed.2d 666, 677 (1990) (citations omitted) (emphasis added). The United States Supreme Court long ago clarified the primary objective of the Confrontation Clause:
*125 [T]he particular vice that gave impetus to the confrontation claim was the practice of trying defendants on 'evidence' which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact .....
[O]bjections occasioned by this practice appear primarily to have been aimed at the failure to call the witness to confront personally the defendant at his trial. So far as appears, in claiming confrontation rights no objection was made against receiving a witness' out-of-court depositions or statements, so long as the witness was present at trial to repeat his story and to explain or repudiate any conflicting prior stories before the trier of fact .
Our own decisions seem to have recognized at an early date that it is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause[.]
California v. Green , 399 U.S. 149, 156-57, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489, 496 (1970) (citations and footnotes omitted) (emphasis added). "Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' " Crawford v. Washington , 541 U.S. 36, 61, 124 S.Ct. 1354, 1370, 158 L.Ed.2d 177, 199 (2004) ; see also Fowler , 353 N.C. at 615, 548 S.E.2d at 696 ("This prong of the Roberts inquiry is called the 'Rule of Necessity.' In analyzing this prong, a witness is not 'unavailable' for purposes of the ... confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial.") (citation omitted).
The United States Supreme Court has stated concerning the admission of testimonial evidence by some means other than the testimony of the declarant at trial:
First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity . In the usual case (including cases where prior cross-examination has occurred ), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.
*126 The second aspect operates once a witness is shown to be unavailable .
Ohio v. Roberts , 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597, 607 (1980), abrogated on other grounds by Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (emphasis added) (citations omitted). This Court has defined three separate steps required to admit testimonial evidence in the absence of the declarant witness:
Our Court has held that evaluating whether a defendant's right to confrontation has been violated is a three-step process. We must determine: "(1) whether the evidence admitted was testimonial in nature; (2) whether the trial court properly ruled the declarant was unavailable; and (3) whether *552 defendant had an opportunity to cross-examine the declarant."
State v. Allen , 171 N.C.App. 71, 74-75, 614 S.E.2d 361, 364-65 (2005) (citations omitted).
These three steps are separate and sequential, they are not three factors in a balancing test. Therefore, the trial court must first make a determination of whether the relevant evidence is testimonial in nature; if the trial court determines that the evidence is testimonial, then it must determine whether the declarant witness is unavailable for trial; only upon finding in the affirmative for the first two inquiries must the trial court make a determination concerning the defendant's prior opportunity to cross-examine the declarant witness. Id . ; see also State v. McLaughlin , --- N.C.App. ----, ----, 786 S.E.2d 269, 277, appeal dismissed, disc. review denied, --- N.C. ----, 787 S.E.2d 29 (2016). Therefore, in this matter, our unavailability analysis does not consider the fact that Defendant's attorney had the opportunity to fully cross-examine Whisman in Defendant's presence, before a trial judge applying the rules of evidence, or that the examination was recorded on video and by a court reporter. See Barber , 390 U.S. at 725-26, 88 S.Ct. at 1322, 20 L.Ed.2d at 260.
In the present case, Whisman's deposition testimony clearly qualifies as "testimonial" for Confrontation Clause purposes. Our analysis therefore next focuses solely on whether the State carried its burden of demonstrating the unavailability of Whisman for trial to a degree that survives constitutional scrutiny, and whether the trial court's ruling comports with the constitutions of North Carolina and the United States, and other relevant law.
The entirety of the trial court's findings of fact related to the State's burden to prove Whisman's unavailability at trial is as follows: "The *127 Court finds [Whisman] is in the military and is stationed outside of the State of North Carolina currently. May be in Australia or whereabouts may be unknown as far as where she's stationed." The trial court made no findings demonstrating the necessity of proceeding to trial without Whisman's live testimony. The trial court did not address the option of continuing trial until Whisman returned from her deployment, nor did it determine that the State "made a good-faith effort to obtain [Whisman's] presence at trial" through its last minute attempt to subpoena her. Barber , 390 U.S. at 725, 88 S.Ct. at 1322, 20 L.Ed.2d at 260. Further, " 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff.' " Id. at 724, 88 S.Ct. at 1322, 20 L.Ed.2d at 260. Therefore the State's argument that, even after [Whisman] returned from her Darwin deployment, "she could be deployed again[,]" does not carry weight. It is always possible that a service member could be deployed out of the country. This ambiguous but persistent possibility cannot serve to render every service member "unavailable" for an upcoming trial and thereby justify infringement of a defendant's constitutional right to confront that service member, should the State wish to present testimonial evidence from that service member at trial.
We note that, when considering a defendant's claim that his Sixth Amendment right to a speedy trial has been violated, the United States Supreme Court, as well as the appellate courts of North Carolina, have repeatedly held that granting a continuance based upon the temporary unavailability of a witness, especially an essential witness, is often appropriate, and is a factor that may justify delay of a trial even when the defendant is requesting a "speedy trial" as guaranteed under the Sixth Amendment. See Barker v. Wingo , 407 U.S. 514, 531, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972) ("a valid reason, such as a missing witness, should serve to justify appropriate delay [in bringing a defendant to trial]"); State v. Jones , 310 N.C. 716, 719-20, 314 S.E.2d 529, 532 (1984). We see no legitimate reason why a trial court should not continue a trial to protect a defendant's confrontation rights with the same flexibility that it offers the State when it agrees to continue a trial in order for the State to present testimony of an important witness at that trial. We find no compelling interest justifying the denial of Defendant's request to continue the trial to allow for Whisman's live testimony. The mere convenience of the State offers no such compelling interest:
*553 [R]espondent asks us to relax the requirements of the Confrontation Clause to accommodate the " 'necessities of trial and the adversary process.' " It is not clear whence we would derive the authority to do so. The Confrontation *128 Clause may make the prosecution of criminals more burdensome, but that is equally true of the right to trial by jury and the privilege against self-incrimination. The Confrontation Clause-like those other constitutional provisions-is binding, and we may not disregard it at our convenience.
Melendez-Diaz v. Massachusetts , 557 U.S. 305, 325, 129 S.Ct. 2527, 2540, 174 L.Ed.2d 314, 330 (2009).
Upon review of Confrontation Clause jurisprudence, we note that a finding of unavailability is generally proper when there is no possibility the witness can be produced at trial, such as in cases when the witness has died or is terminally ill.[16] A finding of unavailability may be proper when the State demonstrates that the witness is highly unlikely to be available for trial at any known date, such as when the witness has fled the country in an intentional effort to avoid testifying, or the State demonstrates that, after making sufficient reasonable efforts, it has been unable to locate the witness.[17] The common thread justifying entry of prior recorded testimony is that the witness is either demonstrably unavailable for trial, or there is no evidence to support a finding that, with a good-faith effort by the State, the witness may be made available at some reasonable time in the future .
By contrast, when a witness is unavailable for a limited period of time, courts have been reluctant to find that witness unavailable for Confrontation Clause purposes. See Peterson v. United States , 344 F.2d 419, 425 (5th Cir. 1965) (Witness not found "unavailable" for Confrontation Clause purposes because she "was not dead, beyond the reach of process nor permanently incapacitated. She was simply unavailable at the time of trial because of her pregnancy. Considering the seriousness of the charges and if the Government desired to use [her] testimony, it should have requested a continuance to a time when she could probably be present .") (emphasis added); Smith v. United States , 106 F.2d 726, 728 (4th Cir. 1939) (Prior testimony of an unavailable witness "is admitted only because the witness cannot be produced; and it should not be admitted where the presence of the witness at the trial of the cause might be had by the exercise of due diligence ..... That while *129 it appeared from the testimony of Dr. Handy that [the witness] was, at the time of this trial, in such condition as not to be available as a witness, it likewise appeared that Dr. Handy considered this condition as temporary." Therefore, the witness should have "been subpoenaed as a witness" or motion "made for a continuance of the case because of her illness and until she could testify.") (Emphasis added).
We note that these medical "unavailability" cases are specifically contemplated in Rule 804 : " Evidence Rule 804(a)(4) states that a witness is unavailable if she is unable to testify due to 'an existing physical or mental illness or infirmity.' "[18] State v. Carter , 338 N.C. 569, 591, 451 S.E.2d 157, 169 (1994) (citation omitted). There is no such statutory exception for an inability to testify due to military deployment.
Further, the expected duration of the witness' unavailability must be considered, and according to some authority, the expected duration must be such that there is no guarantee the witness will ever be available for trial:
In criminal prosecutions, according to the weight of authority, the mere temporary illness or disability of a witness is not sufficient to justify the reception of his former testimony....
....
*554 ... it must appear that the witness is in such a state, either mentally or physically, that in reasonable probability he will never be able to attend the trial.
United States v. Amaya , 533 F.2d 188, 191 (5th Cir. 1976) (citations omitted). The Amaya Court recognized that some jurisdictions' requirements are not as rigid:
Although the duration of an illness is a proper element of unavailability, the establishment of permanence as to the particular illness is not an absolute requirement. The duration of the illness need only be in probability long enough so that, with proper regard to the importance of the testimony, the trial cannot be postponed.
Id . (citation omitted).
*130 Although we have been unable to find binding precedent directly related to the issue of military deployment and unavailability for Confrontation Clause purposes, the United States Court of Military Appeals has rejected a finding of unavailability of a witness due to deployment based upon the following reasoning:
When offering the deposition on November 29, trial counsel represented to the military judge that the witness was on board ship and that the ship was still in training..... Because the information provided to the military judge was not current, the actual unavailability of the witness at the time the deposition was offered into evidence was not established. Cf. Burns v. Clusen , 798 F.2d 931, 943 (7th Cir.1986) (Government's burden to establish "unavailability is a continuing one").
Moreover, it is clear that the refresher training had been scheduled for months and was known well in advance by trial counsel . In spite of this, there appears to have been no accommodation made in setting the date of trial so the witness could testify before the factfinder. Certainly, the record provides no explanation why trial could not have commenced earlier or concluded later so the temporary unavailability of the witness would not have necessitated resort to "a weaker substitute for live testimony." United States v. Inadi , [475 U.S. 387], 106 S.Ct. [1121] at 1126 [89 L.Ed.2d 390 (1986) ].
United States v. Vanderwier , 25 M.J. 263, 266-67 (C.M.A. 1987) (citation omitted) (emphasis added).[19]
We hold that, just as in cases of unavailability due to mental or physical illness, in order for the State to show that a witness is unavailable for trial due to deployment, the deployment must, at a minimum , be "in probability long enough so that, with proper regard to the importance of the testimony, the trial cannot be postponed." Amaya , 533 F.2d 188, 191.[20] In the present case, the State described Whisman as "an essential *131 witness," and we concur. Though Defendant had been afforded the ability to cross-examine Whisman before trial, that fact has no bearing on Whisman's "unavailability" at trial for Confrontation Clause purposes. See Barber , 390 U.S. at 725-26, 88 S.Ct. at 1322, 20 L.Ed.2d at 260 ("while there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable , this is not, as we have pointed out, such a case") (emphasis added).
There were many steps the State could have taken to demonstrate a good-faith attempt to procure Whisman for trial, including, primarily, requesting continuance of the trial until she was available. We hold, on the facts before us, that the failure to continue the trial until after Whisman's deployment *555 ended in December 2015, alone, constituted a violation of Defendant's confrontation rights.
Additional steps that the State could have taken to demonstrate a "good faith effort" to procure Whisman's presence at trial include either requesting that she remain under subpoena until trial instead of requesting that she be released from her subpoena, or serving her with a new subpoena while she was in North Carolina for her 23 March 2015 deposition. Finally, if the State wanted to make a serious attempt to serve Whisman with a subpoena by mail while she was deployed in Australia, it should have attempted service at a much earlier date, and complied with the Code rules concerning service. "In this case the state authorities made no effort to avail themselves of ... alternative means of seeking to secure [Whisman's] presence at ... trial." Barber , 390 U.S. at 724, 88 S.Ct. at 1322, 20 L.Ed.2d at 259-60.
We hold that the State did not present the trial court with evidence sufficient to demonstrate it had made a good-faith effort to obtain Whisman's presence at trial:
[A] witness is not 'unavailable' for purposes of ... the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial. The State made no such effort here, and, so far as this record reveals, the sole reason why [the State's witness] was not present to testify in person was because the State did not attempt to seek [her] presence. The right of confrontation may not be dispensed with so lightly.
Id . at 724-25, 88 S.Ct. at 1322, 20 L.Ed.2d at 260.
*132 We further hold, for the same reasons enumerated above, that allowing Whisman's deposition testimony in lieu of her live testimony at trial violated the relevant protections of Article I of the North Carolina Constitution:
" 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact .' " We have generally construed the right to confrontation under our state constitution consistent with its federal counterpart.
Nobles , 357 N.C. at 435, 584 S.E.2d at 768 (emphasis added) (citations omitted). For these additional reasons, we hold that the trial court erred in allowing Whisman's deposition testimony to be entered into evidence in lieu of her live testimony at trial, and that the trial court further erred in denying Claim 1 in Defendant's amended MAR.
4. Prejudice
Because we have found that denying Defendant the opportunity to confront Whisman at trial and in front of the jury violated the Confrontation Clause, "[D]efendant is presumed to have been prejudiced[, and] the burden is upon the State to show beyond a reasonable doubt that the error was harmless. N.C. Gen. Stat. § 15A-1443(b) (2005)." State v. Bowman , 188 N.C.App. 635, 650, 656 S.E.2d 638, 650 (2008) (citation omitted). The United States Supreme Court has held regarding the deprivation of a defendant's right to cross-examine a State's witness in front of the jury:
The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized , a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
*133 Delaware v. Van Arsdall , 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674, 686 (1986) (citations omitted) (emphasis added).
a. Defense of Others
Defendant did not deny shooting Allen on the night of 28 July 2014; his defense at trial was that he was justified in shooting *556 Allen because he believed it was necessary to protect Whisman from death or great bodily harm.[21]
In general one may kill in defense of another if one believes it to be necessary to prevent death or great bodily harm to the other and has a reasonable ground for such belief, the reasonableness of this belief or apprehension to be judged by the jury in light of the facts and circumstances as they appeared to the defender at the time of the killing.
State v. Perry , 338 N.C. 457, 466, 450 S.E.2d 471, 476 (1994) (citations and quotation marks omitted).
The State argues that "there was overwhelming evidence of [D]efendant's guilt even without [ ] Whisman's testimony." However, it is the State's burden to prove beyond a reasonable doubt that the error of denying Defendant the right to confront Whisman live, in front of the jury, was harmless. Bowman , 188 N.C.App. at 650, 656 S.E.2d at 650. The error was not in admitting Whisman's testimony, it was in the manner in which it was admitted. Therefore, in order to prove beyond a reasonable doubt that the error was harmless, the State must show that there was no "reasonable possibility that the [error] complained of might have contributed to the conviction." State v. Heard , 285 N.C. 167, 172, 203 S.E.2d 826, 829 (1974).
Defendant's argument is not that Whisman's testimony should have been excluded, it is that because he was deprived of his right to cross-examine Whisman at trial, in front of the jury, his case was prejudicially weakened. Resolution of this case almost entirely relied upon the testimonies and statements of all three witnesses that were present at the shooting, and Whisman was the witness most likely to have had sway with the jury; the State referred to Whisman as the "one objective witness who was there[.]"
*134 The jury could have believed Allen, Defendant, or Whisman exclusively, or it could have believed any combination of their statements. A thorough and complete examination of Whisman's and Allen's testimony at trial was therefore of paramount importance in swaying the jury to either Defendant's or the State's evidence of events. If the jury believed Allen completely, then it would have likely believed he posed no immediate threat to Whisman or Defendant at the time Defendant shot him.
However, if there was a reasonable possibility the jury could have been swayed to accept Defendant's statements to police in their entirety, and believed Allen's testimony in a light favorable to Defendant, it would have found the following: Allen was a man prone to bouts of violent rage, and Defendant had witnessed Allen severely beat people in the past. Even though Allen himself did not believe Defendant was drunk, Allen went into a rage when he saw that Defendant was attempting to drive Whisman back to her hotel, so he grabbed his handgun, ran to Whisman's door screaming obscenities, and managed to get the keys to Whisman's Jeep from Defendant and throw them into the woods. After Whisman retrieved her spare keys and got into the driver's seat of her Jeep, Allen shoved Defendant out of the way, "grabbed [Whisman] by the hair, [and] pulled her out onto the ground." While on the ground, Whisman laughed, which "infuriated" Allen, causing him to grab Whisman off the grown, thrust her against a tree, and put his hands around her throat, get directly in her face, and ask her "if she thought it was a f*ucking joke."
Whisman was terrified and hysterical, and Defendant stepped between her and Allen because Defendant "knew that [Allen] would go off. And with [Whisman] in close proximity, that could not be a very good thing." Whisman was "screaming she was afraid for her life," screamed "help" many times, and screamed " Sam [Defendant], don't let him do this to me again." "Obviously ... [Whisman] was afraid of [Allen.]"
Allen later confronted Whisman and Defendant and told them they could not leave, and that Defendant needed to "[f]ix your bitch[,]" and "get her under control." As *557 Allen confronted Defendant, Defendant kept his hands firmly in his pants pockets because his handgun was in his waistband and he did not want appear to be a threat, or have Allen take Defendant's gun, or have Allen retrieve his own gun. Defendant was not provoking Allen, but Allen "chest pushed" Defendant a few times. Allen then used his right fist to hit Defendant twice in the face, and Allen was "infuriated at [that] point[.]" Defendant knew Allen could easily best him in a fistfight.
After punching Defendant twice, Allen "changed targets" and "went after [Whisman] and had his hand around her throat again and leg-swept *135 her onto the ground." Allen held Whisman's hair with one hand, and drew his other fist back like he was going to punch Whisman in the face. Defendant screamed Allen's name to get him to stop his assault on Whisman, but Allen did not stop. At this point, Defendant "decided that [Allen] was going to kill either of us, or at least seriously injure, so I made a split instant decision to defend myself and her." Believing Whisman was in imminent danger of being brutally assaulted by a man who was too strong and proficient in fighting for Defendant to physically control, Defendant shot Allen to prevent him from seriously injuring, or even killing, Whisman. Based upon Allen's actions that evening, Whisman, too, believed that Allen was going to kill her.
The State itself, during its closing argument, admitted that important aspects of Defendant's story were correct, and thus Allen had credibility issues:
[B]oth [Whisman] and [D]efendant tell us that ... Allen had [Whisman] up against the tree briefly. [D]efendant said that he had her by the throat. She said it was sort of the shoulder/neck area. [ ] Allen did not say this happened, but, again, the two of them pretty quickly after this happened said that that's what happened, so I think you could reasonably assume that there was something like that going on.
Because Whisman's testimony was presented by video deposition, Defendant had no opportunity to cross-examine her in response to testimony and evidence that came to light at trial. The State must show beyond a reasonable doubt that Defendant's lost opportunities to fully cross-examine Whisman in front of the jury would not have affected either the jury's credibility determinations or its decisions on issues of fact in a manner that "might have contributed to the conviction." Heard , 285 N.C. at 172, 203 S.E.2d at 829.
The opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process. Cross-examination is "the principal means by which the believability of a witness and the truth of his testimony are tested." Indeed, the Court has recognized that cross-examination is the " 'greatest legal engine ever invented for the discovery of truth.' " The usefulness of cross-examination was emphasized by this Court in an early case explicating the Confrontation Clause:
*136 "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity ... of testing the recollection and sifting the conscience of the witness [.]
Kentucky v. Stincer , 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631, 641-42 (1987) (citations omitted). The United States Supreme Court, discussing Davis v. Alaska , 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), has considered the prejudice implications of a defendant being denied the right to fully cross-examine a state's witness in violation of the Confrontation Clause:
Defense counsel was barred from eliciting on cross-examination that [the witness] was on juvenile probation for burglary both at the time of his pretrial identification of [the defendant] and at the time of trial. The defense sought to suggest that [the witness] may have slanted his account in the State's favor either to shift suspicion away from himself or to avoid revocation of probation for failing to "cooperate." This Court reversed [the defendant]'s conviction, emphasizing that [the witness]'s testimony was "crucial" and that there was a "real possibility" that pursuit of the excluded *558 line of impeachment evidence would have done "[s]erious damage to the strength of the State's case."
Van Arsdall , 475 U.S. at 683, 106 S.Ct. at 1438, 89 L.Ed.2d at 686 (citations omitted). As the United States Supreme Court has reasoned when a defendant was not permitted to fully cross-examine an essential witness concerning issues of credibility:
We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the State's witness'] testimony which provided 'a crucial link in the proof ... of petitioner's act.' The accuracy and truthfulness of [the State's witness'] testimony were key elements in the State's case against petitioner.
Davis v. Alaska , 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347, 354 (1974).
*137 Had Whisman been present to testify at trial, she could have stated directly to the jury that Allen was lying when he testified that he never assaulted Whisman by holding her up against a tree by her neck, and when Allen testified that he did not throw her to the ground right before the shooting. Being confronted with Allen's actual testimony, Whisman could have provided additional relevant testimony that was not brought forth in her deposition, which was conducted without Defendant having the benefit of the State's actual evidence at trial, including Allen's actual testimony. Had Whisman been given the opportunity to respond directly to Allen's testimony, she could have both created more doubt in the minds of the jurors concerning Allen's credibility, and could have provided additional testimony surrounding the contested issues.
For example, Whisman could have: responded to Allen's comment that early on in the confrontation "[o]bviously, for some reason she was afraid of me[,]" and that later Whisman was "screaming she was afraid for her life[,]" by explaining why Allen made her feel that way; responded to Allen's testimony that he did not clap his hands and call Whisman like he was calling a "dog;" clarified why she was yelling "help," if in fact she was doing so; or contested Allen's testimony that Whisman pushed Allen and hit him on the top of his head, and then came after Allen again after he pushed her away. In light of Defendant's and Allen's conflicting statements concerning Allen's actions right before Defendant shot him, Whisman, had she been able to testify at trial, could have more fully addressed those critical last moments, potentially providing more credibility and support for Defendant's version of those most relevant events.
Finally, Whisman was unable to respond to Allen's testimony that she screamed: "Sam [Defendant], don't let him do this to me again." The State, because Whisman did not testify at trial, was able to argue to the jury that Whisman was not asking Defendant to protect her from Allen, but was having a "flash-back" to some earlier unrelated assault. Not only did the State's depiction of Whisman's statement serve to potentially diminish the jury's understanding of Whisman's fear of Allen, it also served to potentially plant in the minds of the jurors that Whisman was over-reacting to Allen's actions in response to some prior trauma. The jury could have believed Whisman was, perhaps even sub-consciously, irrationally inflating her fear of Allen's intent in the crucial moments just before Allen was shot. The jury could have diminished or discounted Whisman's testimony that Allen threw her to the ground so hard her glasses came off, then he came after her, was "over the top of [her]" as she lay on the ground, and that she did not believe Allen "was going to stop" his assault. It was potentially critically important whether the *138 jury believed Whisman's stated beliefs that "[Allen] was going to kick my face in[,]" and that she "was really afraid [Allen] was going to-he was going to kill me[,]" were reasonable. We therefore hold that the State failed to prove beyond a reasonable doubt that denial of Defendant's constitutional right to confront Whisman at trial and in front of the jury had no prejudicial effect on the *559 jury's rejection of his "defense of another" defense.
b. Intent to Kill
Assuming arguendo the jury rejected both of Defendant's defenses-self-defense and defense of another-the jury still could have found that Defendant, though acting unlawfully, did not intend to kill Allen, his "brother," but merely sought to prevent Allen from further assaulting Whisman. State v. Daniel , 333 N.C. 756, 763, 429 S.E.2d 724, 729 (1993) ("A specific intent to kill is an essential element of assault with a deadly weapon with intent to kill inflicting serious injury. N.C.G.S. § 14-32(a) (1986).") (citation omitted). Determination of the lack, or presence, of a defendant's specific intent to kill is an "ultimate issue[ ] to be determined by the jury." Daniel , 333 N.C. at 763, 429 S.E.2d at 729 (citations omitted). Absent the jury finding that Defendant intended to kill Allen, it could have at most convicted him of the lesser included offense of assault with a deadly weapon inflicting serious injury.
The State's theory that Defendant formed the intent to kill Allen because he was humiliated by having been punched by Allen required a fair amount of speculation based upon circumstantial evidence. The State further argued that the fact that Defendant shot Allen three times instead of firing once, or firing a warning shot, was proof of Defendant's intent to kill. Though we agree the jury could reasonably view the facts in that manner, we hold that the State has failed to demonstrate there was no "reasonable possibility that [denial of Whisman's live testimony in front of the jury] might have contributed to the conviction." Heard , 285 N.C. at 172, 203 S.E.2d at 829.
There was testimonial evidence that Defendant was never the aggressor during the altercations leading up to the shooting; that Defendant attempted on multiple occasions to calm both Allen and Whisman, and thereby de-escalate the volatile situation; that Defendant did not react violently when Allen pushed him, or immediately after Allen punched him twice in the face; and that Defendant called out to Allen several times before pulling the trigger, which the jury could have interpreted as an attempt to get Allen to stop assaulting Whisman before resorting to potentially deadly force. Further, Defendant called 911 and administered *139 first aid to Allen until the police arrived. The jury could have determined that, though Defendant was not legally justified in shooting Allen three times, he never formed a specific intent to kill his best friend.
The jurors' decisions on these issues were undoubtedly influenced by the weight they gave to both Defendant's statement and Whisman's testimony. We hold that there was a reasonable possibility that had Defendant been allowed to further explore Whisman's testimony concerning Allen's assaultive actions, her fear that Allen was going to "kick her face in" or "kill her," and her plea: "Sam [Defendant], don't let him do this to me again[,]" the jury could have decided this additional "testimony was 'crucial' and that there was a 'real possibility' that pursuit of the excluded line of impeachment evidence [against Allen] would have done '[s]erious damage to the strength of the State's case' " that Defendant intended to kill Allen. Van Arsdall , 475 U.S. at 683, 106 S.Ct. at 1438, 89 L.Ed.2d at 686 (citations omitted); see also Id . at 683-84, 106 S.Ct. at 1438, 89 L.Ed.2d at 686 (Remand was required because though "it is impossible to know how [the] wrongfully excluded evidence would have affected the jury ... [the defendant] was denied an opportunity to cast doubt on the testimony of an adverse witness. [T]he prosecution was thus able to introduce evidence that was not subject to constitutionally adequate cross-examination. [T]he reviewing court should be able to decide whether the not-fully-impeached evidence might have affected the reliability of the fact-finding process at trial.").
c. Prejudice Conclusion
Whisman's testimony was of overwhelming importance to Defendant's defense; her testimony was not cumulative, because it served as the most objective of three sometimes competing recitations of the relevant events. Her testimony was generally corroborated by both Allen and Defendant, but contradicted Allen's testimony in ways that, if further explored, could have had an impact on the jury's credibility assessments, and thus its *560 verdict. The State's case relied primarily on the testimony of the witnesses concerning Allen's actions and the threat he posed that night, as the fact that Defendant shot Allen three times was not in dispute. We hold that "the not-fully-impeached evidence might have affected the reliability of the fact-finding process at trial[,]" Van Arsdall , 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686 and, therefore, the State has failed in its burden of proving the deprivation of Defendant's constitutional rights was "harmless beyond a reasonable doubt." Id . at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 687. We make this holding both with respect to the possibility that the jury might have accepted Defendant's "defense of another" claim, and with respect to the possibility that the jury might have *140 determined that Defendant did not act with the intent to kill Allen and, therefore, could, at most, have been convicted of the lesser included offense of assault with a deadly weapon inflicting serious injury.
B. Jury Instruction
In Defendant's second argument, he contends that "the trial court erred by failing to instruct the jury on imperfect self-defense and imperfect defense of others[.]" We disagree.
Defendant did not request the trial court give any instruction on imperfect self-defense or imperfect defense of others. In fact, when the State indicated that it believed imperfect self-defense or imperfect defense of others was not legally available to Defendant in this situation, Defendant's counsel agreed with the State. Defendant cannot show prejudice from invited error. See State v. Hope , 223 N.C.App. 468, 472, 737 S.E.2d 108, 111 (2012).
By informing the trial court that he agreed instructions on imperfect self-defense or imperfect defense of others were not legally available to him, Defendant invited any alleged error, and waived right to appellate review. Id . Defendant is, of course, free to request those instructions should this matter again proceed to trial. We therefore further hold that the trial court did not err in denying the related claim, Claim II, in Defendant's amended 15 December 2015 MAR.
III. Conclusion
We point out in response to the dissenting opinion that a new trial is granted for multiple and independent reasons, including: (1) The trial court failed to make required findings of fact concerning Whisman's unavailability. See Nobles , 357 N.C. at 440, 584 S.E.2d at 771 ; Triplett , 316 N.C. at 8, 340 S.E.2d at 740-41. (2) The evidence presented at the hearing on the State's motion in limine was insufficient to meet the State's burden of demonstrating Whisman's unavailability for purposes of both Rule 804(a)(5) and the Confrontation Clause. We specifically hold that the State's attempt to subpoena Whisman for trial did not constitute "a good-faith effort to obtain [her] presence at trial" as required by Barber . Barber , 390 U.S. at 725, 88 S.Ct. at 1322, 20 L.Ed.2d at 260. We further hold that there were reasonable alternative methods for procuring Whisman's testimony that the State could have pursued, but did not; instead relying solely on its inadequate and belated attempt to subpoena Whisman in Australia. Id . at 724, 88 S.Ct. at 1322, 20 L.Ed.2d at 259-60. These alternatives included, inter alia , simply keeping Whisman under subpoena until trial, in light of the fact that she had been successfully served prior to 23 March 2015. (3) Neither *141 the State nor the trial court presented adequate justification for denying Defendant's request to continue the trial to a date subsequent to the end of Whisman's deployment; further, the trial court failed to even address this issue in its order granting the State's motion in limine .
Concerning the first reason for granting a new trial, the dissenting opinion agrees that the trial court failed to make the necessary findings of fact. See Triplett , 316 N.C. at 8, 340 S.E.2d at 740-41. However, the dissenting opinion differs with the majority opinion concerning what, if any, remedy is thereby required.
Concerning the second reason, the dissenting opinion disagrees with our holding that the State did not make a good-faith effort to obtain Whisman's presence at trial, focusing on steps the State took to procure Whisman for her deposition testimony, and the fact that the State gave Defendant proper notice *561 of its intention to admit her deposition testimony. However, these actions are not relevant to Confrontation Clause unavailability analysis. See Barber , 390 U.S. at 725-26, 88 S.Ct. at 1322, 20 L.Ed.2d at 260. The only action taken by the State to procure Whisman for trial was the subpoena-non-compliant with the Code service procedures-that was mailed to Australia shortly before the beginning of the trial, and which in all likelihood was never served on Whisman. Although the dissenting opinion also appears to give weight to the State's argument that there was a possibility that Whisman could be subject to future deployments, "the prosecution must either produce, or demonstrate the unavailability of , the declarant whose statement it wishes to use against the defendant." Roberts , 448 U.S. at 65, 100 S.Ct. at 2538, 65 L.Ed.2d at 607 (emphasis added) (citations omitted). The State was required to demonstrate that proceeding to trial without the presence of Whisman was necessary . Id . The hypothetical possibility that Whisman might have been unavailable at some future date is insufficient to demonstrate her actual unavailability. See Barber , 390 U.S. at 724, 88 S.Ct. at 1322, 20 L.Ed.2d at 260 (" 'the possibility of a refusal is not the equivalent of asking and receiving a rebuff' "); Nobles , 357 N.C. at 438, 584 S.E.2d at 770 (" '[i]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation' ") (emphasis omitted).
Concerning the third reason, the dissenting opinion does not address the State's failure to request a continuance, the State's express resistance to Defendant's motion to continue, nor the trial court's denial of Defendant's motion to continue. The dissenting opinion does state that "[a]ll parties knew Whisman was serving on active duty and subject to repeated deployments[.]" While true, we do not believe the fact that all service members may be subject to deployment at some unknown future *142 date renders them all "unavailable" for Confrontation Clause purposes, nor does this fact absolve the trial court from the need to consider a continuance instead of depriving a defendant of his constitutional right of confrontation. The Confrontation Clause requires more than the temporary inability of a material witness to attend trial at a certain date if the trial can reasonably be continued to a date when the witness would likely be available. See Peterson , 344 F.2d at 425 ; Smith , 106 F.2d at 728 ; Vanderwier , 25 M.J. at 266-67. We hold above that, in order for the State to show a witness is unavailable for trial due to deployment, the deployment must, at a minimum , be "in probability long enough so that, with proper regard to the importance of the testimony, the trial cannot be postponed." Amaya , 533 F.2d at 191.
In conclusion, we hold that the trial court erred in allowing Whisman's deposition testimony to be entered into evidence in lieu of her live testimony in violation of both N.C. Gen. Stat. § 8C-1, Rule 804, and the provisions of the constitutions of both the United States and North Carolina. We so hold because: (1) the trial court failed to make the required findings of fact to demonstrate unavailability for the purposes of Rule 804 or the Confrontation Clause; (2) the State failed in its burden of showing Whisman could not be made present at trial "by process or other reasonable means." N.C. Gen. Stat. § 8C-1, Rule 804(a)(5) ; and (3) the State failed in its burden of proving it had carried its constitutionally required burden of demonstrating that it had "made a good-faith effort to obtain [Whisman's] presence at trial." Barber , 390 U.S. at 724-25, 88 S.Ct. at 1322, 20 L.Ed.2d at 260. We further hold that the State has failed in its burden of proving the deprivation of Defendant's constitutional rights was "harmless beyond a reasonable doubt." Van Arsdall , 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 687. Finally, Defendant failed to preserve appellate review of his jury instruction argument.
NEW TRIAL.
Judge STROUD concurs.
Judge Tyson dissents by separate opinion.

Defendant and Whisman were planning to drive back to the hotel at that time, and would naturally have their firearms with them. It is unclear why Allen thought he should take his gun to confront Defendant and Whisman at her Jeep.

Allen often referred to Defendant as "Doc."

"There is no statute in North Carolina authorizing the taking of depositions to be used as evidence by the State in criminal prosecutions. This privilege is extended to the defendant in certain cases [N.C. Gen. Stat. § 8-74 ], but it may not be exercised by the State as a matter of right. With respect to the witnesses offered by the prosecution, the defendant has the right to demand their presence in the courtroom, to confront them with other witnesses, and to subject them to the test of a competent cross-examination where their bearing and demeanor may be observed by the jury. The defendant may not be required, against his will, to examine the State's witnesses in the absence of the jury. He 'is entitled to have the testimony offered against him given under the sanction of an oath, and to require the witnesses to speak of their own knowledge, and to be subjected to the test of a competent cross-examination.' " State v. Hartsfield , 188 N.C. 357, 359, 124 S.E. 629, 630 (1924) (citations omitted). We note that N.C. Gen. Stat. § 8-74 allows a defendant to depose a witness in certain circumstances when that witness's ability to attend trial is in question, but includes no corresponding provision providing the same authority to the State in a criminal trial.

Absent a jury determination that Defendant intended to kill Allen, the most that the jury could have convicted Defendant of would have been assault with a deadly weapon inflicting serious injury.

Also known as "defense of a third person."

Although the prior orders of the other judges were presumably before the trial court on 15 June 2015, none of the findings of the prior orders were adopted by the trial court in its 15 June 2015 ruling.

AE stands for "Armed Forces Europe" which is the incorrect designation for Marine Rotational Force Darwin, which should have been AP-"Armed Forces Pacific."

A different person was given as the "point of contact" in each of the two letters.

We assume these items are included as part of Exhibit C, though they are not clearly marked as such.

The State acknowledges that "[t]here is no indication in the record that the subpoena was served on [ ] Whisman."

32 C.F.R. § 720.42 is the section establishing appropriate "reasons" for requests for return. 32 C.F.R. § 720.41 ("Request for return. Any request or order received from a court, or from federal, state or local authorities concerning a court order , for the return to the United States of members ... for any reason listed in § 720.42."). Though Subpart D seems to be primarily related to the return of "members" to face criminal charges, there is nothing in Subpart D making this specific limitation. See 32 C.F.R. § 720.41 ("Respondent. A member, employee, or family member whose return to the United States has been requested, or with respect to whom other assistance has been requested under this instruction.").

There is no record evidence supporting this contact between the State and the Navy beyond the generic 20 May 2015 letter from the Commanding Officer of the 1st Medical Battalion of the Marine Corps.

We presume Defendant meant until after December 2015.

The "New Navy Standardized FPO Mail Address Format" requires the intended recipient's name, listed first. See http://www.navy.mil/submit/display.asp?story_id=84519.

See N.C. Gen. Stat. 8C-1, 804(4) (2015); State v. Hurst , 127 N.C.App. 54, 59, 487 S.E.2d 846, 851 (1997).

See State v. Fowler , 353 N.C. 599, 610, 548 S.E.2d 684, 693 (2001) ; State v. Bowie , 340 N.C. 199, 456 S.E.2d 771 (1995).

Statutory provisions cannot, of course, alter constitutional requirements, but we find the distinctions informative in our Sixth Amendment analysis.

We recognize the stark differences between Article III courts and military tribunals, but agree with the proposition that the record must demonstrate some legitimate justification for the refusal to grant a continuance when a defendant's constitutional rights of confrontation are at issue. See O'Callahan v. Parker , 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969), overruled on other grounds by Solorio v. United States , 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987).

"We need not prescribe in this case the exact dimensions of the rule, for under either statement, the Government should have been required to elect either to proceed without [its witness]'s testimony or to request a continuance." Peterson , 344 F.2d at 425.

We limit our review to Defendant's argument that the jury could have found that he was justified in shooting Allen in defense of Whisman, and do not directly address his self-defense claim.