STATE OF NORTH CAROLINA v. DERRICK THOMAS BAILEY

No. COA03-431

(Filed 2 March 2004)

**1. Confessions and Incriminating Statements— voluntariness—handcuffed to chair**

There was no error in the denial of a motion to suppress defendant's in-custody statements to police where there was testimony supporting findings that defendant was given and understood his rights, that he waived those rights and that he was not coerced. Although the statements were given over a six hour period during which defendant was handcuffed to a chair, officers provided food and drink, allowed bathroom breaks, and inquired about defendant's comfort at regular intervals.

**2. Evidence— hearsay—residual exception—unavailable witness—good faith effort to find**

There was competent evidence to support the trial court's conclusion that a witness was not available for purposes of the residual hearsay exception set forth in Rule 804(b)(5) where the

STATE v. BAILEY

[163 N.C. App. 84 (2004)]

State attempted to subpoena the witness and called several telephone numbers provided by a friend. N.C.G.S. § 8C-1, Rule 804(b)(5).

**3. Evidence— hearsay—residual exception—unavailable witness—notice**

There was sufficient notice of the State's intent to introduce an absent witness's hearsay statement to officers under Rule 804(b)(5) where the State informed defendant at the outset of the trial that it intended to offer the statement at trial, and defendant received the statement about a year before trial and did not offer an argument about any prejudice he may have suffered.

**4. Sexual Offenses— substitute parent—babysitter only—evidence insufficient**

A charge of sexual offense by a substitute parent should have been dismissed where there was insufficient evidence that defendant had assumed the position of a parent in the home. The evidence established only that defendant was a babysitter. N.C.G.S. § 14-27.7(a).

**5. Sentencing— consecutive sentences—two convictions from same incident**

There was no error in imposing consecutive sentences for first-degree statutory sexual offense and indecent liberties, even though defendant argued that all of the convictions arose from the same incident.

Appeal by defendant from judgment entered 8 October 2002 by Judge Orlando F. Hudson in Durham County Superior Court. Heard in the Court of Appeals 28 January 2004.

*Attorney General Roy Cooper, by Special Deputy Attorney General Staci Tolliver Meyer, for the State.*

*Richard E. Jester for defendant.*

LEVINSON, Judge.

Defendant appeals from judgments and convictions of first degree statutory rape, indecent liberties, and sexual offense by a person in a parental role. We reverse in part and find no error in part.

The State's evidence showed the following: Lyndell Whitfield testified that in July, 2001, she lived in a Durham, North Carolina, apart-

ment with her boyfriend, Oliver Bonn; four of her children, then ages two through ten; and the defendant. Whitfield and defendant, who met about a year earlier in Williamston, North Carolina, had never dated or had a romantic relationship. In 2000, because Whitfield "needed a driver," she allowed defendant to live with her in return for driving her and her children to work and day care. When Whitfield and Bonn moved to Durham with Whitfield's children, defendant also moved. In exchange for babysitting Whitfield's children while she was at work, Whitfield allowed defendant to sleep in her apartment rent free.

When Whitfield left for work on the morning of 25 July 2001, defendant and her children were in the apartment. Shortly after arriving at work, she returned home for a sweater, and found the children in the living room. Another male friend, Derwood "Shay" Brown, was in her bedroom, and called Whitfield and J.B. (Whitfield's two year old daughter) into the bedroom to talk. He told Whitfield that when he came to the apartment that morning, he found defendant and J.B. lying next to each other on the bedroom floor, and that both were undressed. Whitfield ran outside and prevented defendant from driving away. Officers with the Durham City Police Department arrived in a few minutes and took defendant into custody. Shortly after the police arrived, Whitfield talked to J.B. alone and asked her what had happened. J.B. told Whitfield that defendant had "touched her" and that he took her into a bedroom, took her clothes off, removed his own clothes, and "stuck his man in her front bootie."[1] A few days later, J.B. told her mother about another assault that had occurred when the parties lived in Williamston. On that occasion, defendant barricaded a bedroom door before removing J.B.'s clothes and molesting her. Whitfield also testified that her nine year old son, A.B., told her that defendant "t[ook] his man out and put it in his butt," and that her ten year old daughter, K.B. told her defendant had "put his man in her front bootie."

A.B. testified that defendant had molested him in the past, when A.B.'s family and the defendant lived in Williamston. A.B. and the defendant were in A.B.'s room when the defendant closed the bedroom door, told A.B. to remove his clothes, and "put his man in [A.B.'s] butt." A.B. testified that the defendant had anal sex with him twice in Williamston, and once after they moved to Durham.

---

1. On cross examination, Whitfield explained that she had taught her children to use the terms "man," "front bootie," and "back bootie" instead of penis, vagina, and anus, respectively.

STATE v. BAILEY

[163 N.C. App. 84 (2004)]

Detective David Addison, of the Durham City Police Department, testified that he and Detective Gregory, also of the Durham City Police, arrived at Whitfield's apartment at around 8:30 a.m. on 25 July 2001. They spoke briefly with Whitfield, then met with J.B, who told the officers that the defendant had laid her on her back, and made "hard breathing sounds" while moving "back and forth up and down." She also told the officers that her vaginal area hurt, and that defendant had hurt her. Testimony from Detective Gregory regarding J.B.'s statement tended to corroborate Addison. After speaking with J.B., the officers executed a search warrant for the apartment and defendant's car and removed a child's book and a list of names and phone numbers from the car.

Shortly after police arrived at Whitfield's apartment, the defendant was arrested and transported to the Durham Police Station, where he was interviewed by Officer Robert McLaughlin. Defendant initially told McLaughlin the following: He lived in Whitfield's apartment, where he babysat, cooked, and cleaned. He and Whitfield never dated; she was just a friend. On about eight separate occasions starting in May, 2001, he masturbated on J.B.'s bare bottom. On 25 July 2001 Brown caught him masturbating on J.B., which led to his arrest. McLaughlin reduced defendant's statement to writing, and the defendant read and signed it.

After McLaughlin took the first statement from the defendant, Gregory arrived at the interview room with two items taken from defendant's car: a picture book belonging to another child, and a list of names and phone numbers. This prompted McLaughlin to question defendant further about his sexual contact with J.B., and about whether he had sexual contact with other children. The defendant admitted to McLaughlin that he had vaginal, anal, and oral sex with J.B., and also confessed to sexual contact with sixteen other young children. At McLaughlin's request, defendant provided the officer with a signed list of these children, and told McLaughlin how many times he had sex with each and the type of sexual contact. At the bottom of his handwritten list of children, defendant wrote the following: "I have a problem and I don't . . . know how to deal with it. . . . Can someone help a person like this[?]" McLaughlin then wrote a second statement detailing the defendant's sexual activity with each minor child on defendant's list. Defendant read this statement and signed it. The only change he asked McLaughlin to make was to replace clinical terms such as "anal sex" with defendant's preferred slang phrases. McLaughlin read defendant's statements to the jury.

McLaughlin also read to the jury a statement taken from Shay Brown. In his statement, Brown said that he was at Whitfield's apartment on 25 July 2001. When he opened a bedroom door, he found J.B. and the defendant lying together on the floor, both undressed below the waist, with the defendant holding his penis in his hand. Brown asked J.B. to leave the room, and he and defendant argued about defendant's molestation of J.B. Shortly after Brown discovered the defendant and J.B., Whitfield returned home and he told her about the incident.

Investigator Catherine Lipsey of the Durham Police Department testified that when J.B. was examined at a hospital on 25 July 2001, Lipsey collected J.B.'s undershirt and a forensic rape kit. Dawn Jackson, also of the Durham Police Department, testified that she took hair, saliva, and blood samples from defendant. SBI Agent Jennifer Elwell, a forensic serologist, testified that, after her testing of J.B.'s undershirt showed the presence of semen, she prepared DNA standard samples for J.B. and the defendant, using physical samples taken from each of them. SBI Special Agent Brenda Bissette testified that DNA analysis of the samples prepared by Agent Elwell revealed that the semen found on J.B.'s undershirt matched the DNA in the defendant's blood sample, and that it was her "scientific opinion that the semen that was on [J.B.'s] shirt could be from no other individual except Derrick Bailey[.]"

Dr. Karen Sue St. Claire, a pediatrician with Duke Medical Center, testified that when she examined J.B. on 25 July 2001, she observed that J.B. had redness and puffiness around her urethra and peri-anal area, and "some sticky debris" on her external genitalia. These symptoms, which Dr. St. Claire testified were consistent with "physical trauma," were gone when she examined J.B. again on 30 July 2001.

Defendant did not present any evidence. Following the presentation of evidence, defendant was convicted of all charges and sentenced to consecutive prison terms of 300 to 369 months for first degree rape; 20 to 24 months for indecent liberties; and 15 to 27 months for sex offense by a substitute parent. From these judgments and convictions defendant appeals.

[1] Defendant argues first that the trial court erred by denying his motion to suppress the statements he made to the police. We disagree.

**STATE v. BAILEY**

[163 N.C. App. 84 (2004)]

"The standard for admissibility of a criminal defendant's inculpatory statement is whether, under the totality of the circumstances, the statement was made voluntarily and understandingly." *State v. Hill*, 139 N.C. App. 471, 478, 534 S.E.2d 606, 611 (2000) (citation omitted). Defendant argues that the trial court erred by finding that his statements were voluntary. In support of this argument, defendant asserts that (1) he was handcuffed to a chair in a police interrogation room; (2) the questioning took place over a six hour period; (3) he did not understand his legal rights; and (4) he was threatened by a law enforcement officer.

However, after conducting a hearing, the trial court found, *inter alia*, the following: (1) defendant was in custody at the time he gave his statements to the police; (2) Officer McLaughlin informed defendant of his *Miranda* rights; (3) defendant understood each of his constitutional rights; (4) the defendant knowingly, intelligently, willfully, and voluntarily waived his *Miranda* rights; and (5) the defendant's statements were not the result of any threats or coercion by any law enforcement officer.

"[T]he trial court's findings of fact following a hearing on the admissibility of defendant's statements are binding on this Court and conclusive on appeal if supported by competent evidence, even if that evidence is conflicting." *State v. Hyatt*, 355 N.C. 642, 653, 566 S.E.2d 61, 69 (2002) (citation omitted). In the instant case, we conclude that the court's findings were supported by ample evidence. McLaughlin testified that before conducting the interview he advised the defendant of his *Miranda* rights, using a standard rights form. He determined that the defendant had completed the 12th grade, then read each of the rights listed on the form aloud and questioned defendant to make sure he understood his rights. After this, defendant read the rights form to himself, signed the waiver of rights, and agreed to speak with McLaughlin. Further, McLaughlin observed nothing suggesting defendant was impaired or was unable to understand his situation. We also note that Officer Addison denied touching or threatening the defendant.

Nor do we agree with defendant that the conditions under which the statements were taken were inherently coercive. Although defendant's two statements were taken over a six hour time span, during which defendant was secured to a chair by a single handcuff, the evidence also shows that the law enforcement officers provided defendant with food and drink, inquired about his comfort at regular intervals, and allowed him several bathroom breaks. *See State v.*

*Littlejohn,* 340 N.C. 750, 757, 459 S.E.2d 629, 633 (1995) (upholding trial court's conclusion that confession was voluntary where, after advising defendant of his rights, the "officers then interrogated the defendant for approximately ten hours, at the end of which time the defendant confessed"). This assignment of error is overruled.

Defendant argues next that the trial court erred by admitting hearsay testimony of Derwood Brown. We disagree.

On 25 July 2001, shortly after the alleged incident between J.B. and the defendant, Brown made a statement to law enforcement officers. The contents of this statement were made available to defendant during discovery, approximately a year before trial. At the outset of trial, the State informed the trial court and defendant that it was unable to locate Brown and intended to offer his statement through Officer McLaughlin, pursuant to North Carolina Rules of Evidence, Rule 804(b)(5). Defendant argues that the trial court erred by ruling that the State had satisfied the requirements for admission of evidence under this rule.

Rule 804(b)(5) provides, in relevant part, as follows:

(b) . . . The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:. . . .

(5) . . . A Statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness. . . . However, a statement may not be admitted under this exception unless the proponent of it gives written notice . . . to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

[2] Defendant asserts first that, assuming Brown was unavailable at trial, this was "due to lack of diligence on the part of the State." We agree that "a witness is not 'unavailable' . . . unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page,* 390 U.S. 719, 724-25, 20 L. Ed. 2d 255, 260 (1968). Thus, "we must first determine whether . . . the state made good-faith efforts to locate [the witness]." *State v. Nobles,* 357 N.C. 433, 437, 584 S.E.2d 765, 769 (2003). However, the State is not required to "exhaust all conceivable means in the effort to locate a witness." Instead:

they [must] undertake, in good faith, some reasonable, affirmative measures to produce the witness for trial. . . . [T]he prosecution made repeated efforts to locate [the witness] at the various addresses they had for him both in person and by telephone. That the witness remained unavailable despite these repeated efforts indicates neither a lack of good faith on the part of the prosecution nor a lack of reasonable affirmative measures undertaken to locate [him].

*State v. Grier*, 314 N.C. 59, 68, 331 S.E.2d 669, 676 (1985).

In the case *sub judice*, there was evidence that law enforcement officers tried to subpoena Brown at the address they were given, and called several phone numbers provided by Whitfield. Defendant cites no authority to support the proposition that this was insufficient to constitute reasonable good-faith efforts to locate the witness. We conclude the record contains competent evidence to support the trial court's conclusion that Brown was unavailable.

**[3]** The North Carolina Supreme Court has recently reviewed the other requirements of Rule 804(b)(5):

Once a trial court establishes that a declarant is unavailable . . . the trial court must determine . . . (1) whether proper notice has been given, (2) whether the hearsay is not specifically covered elsewhere, (3) whether the statement is trustworthy, (4) whether the statement is material, (5) whether the statement is more probative on the issue than any other evidence which the proponent can procure through reasonable efforts, and (6) whether the interests of justice will be best served by admission.

*State v. Valentine*, 357 N.C. 512, 517-18, —— S.E.2d ——, —— (2003) (citing *State v. Fowler*, 353 N.C. 599, 608-09, 548 S.E.2d 684, 696 (2001), and *State v. Triplett*, 316 N.C. 1, 8-9, 340 S.E.2d 736, 741 (1986)).

Defendant contests only the notice requirement, and argues that he did not have enough notice of the State's intention to introduce Brown's hearsay statement. "The notice requirement of Rule 804(b)(5) does not mandate a fixed period of time and 'most courts have interpreted the notice requirement somewhat flexibly, in light of the express policy of providing a party with a fair opportunity to meet the proffered evidence.' " *State v. Bullock*, 95 N.C. App. 524, 528, 383 S.E.2d 431, 433 (1989) (quoting *Triplett*, 316 N.C. at 12-13, 340 S.E.2d

at 743). In *Bullock*, the State informed defendant on the second day of trial of its intention to offer the hearsay statement of an unavailable witness. The defendant argued that he did not receive adequate notice. However, the record showed that the defendant received "the substance of [the witness's] statements" in discovery, two months before trial, and that the defendant knew the State intended to call the witness, and knew "in general, the expected content of his testimony." *Id.* On appeal, this Court held that "[g]iven this record, the defendant was neither surprised by the hearsay statements, nor deprived of a fair opportunity to meet them." *Id.*

The instant case presents a factual situation similar to that of *Bullock*. The defendant acknowledged at trial that he received Brown's statement about a year before trial. Moreover, defendant does not offer any argument explaining how he was prejudiced by the amount of notice he received. We conclude the trial court did not err by allowing the State to introduce Brown's hearsay statement. This assignment of error is overruled.

---

**[4]** Defendant argues next that the trial court erred by denying his motion to dismiss the charge of sexual offense by a substitute parent for insufficiency of the evidence. We agree with defendant's contention in this regard.

Upon a defendant's motion to dismiss for insufficiency of the evidence, the trial court must determine whether:

> the evidence is legally sufficient to support a verdict of guilty on the offense charged[.] . . . We must view the evidence in the light most favorable to the State and afford the State every reasonable inference that may arise from the evidence. There must be substantial evidence to support a finding that an offense has been committed and that the defendant committed it. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*State v. Ballew,* 113 N.C. App. 674, 681-82, 440 S.E.2d 565, 570 (1994) (citation omitted).

Defendant herein was convicted of N.C.G.S. § 14-27.7(a) (2003), which provides that:

> (a) If a defendant who has assumed the position of a parent in the home of a minor victim engages in vaginal intercourse or a sexual act with a victim who is a minor residing in the home . . .

the defendant is guilty of a Class E felony. Consent is not a defense to a charge under this section.

This statute has generally been used to prosecute stepparents, *see, e.g., State v. Hall*, 330 N.C. 808, 412 S.E.2d 883 (1992); *State v. Cooke*, 318 N.C. 674, 351 S.E.2d 290 (1987). However, there is no legal requirement that a defendant be the victim's stepparent. *State v. Hoover*, 89 N.C. App. 199, 204, 365 S.E.2d 920, 923 (1988) ("[D]efendant had participated in the foster parent program for approximately 2½ years and . . . during such time, [the victim] was defendant's ward.").

The issue presented herein is whether the State presented sufficient evidence that defendant had "assumed the position of a parent in the home[.]" We have considered appellate cases addressing the relationship between child victims of sexual abuse and defendants who occupy a parental role in the victim's household. We conclude that to convict a defendant of violating G.S. § 14-27.7(a), the evidence of the relationship between the defendant and child-victim must provide support for the conclusion that the defendant functioned in a parental role. Such a parental role will generally include evidence of emotional trust, disciplinary authority, and supervisory responsibility.

In *State v. Raines*, 319 N.C. 258, 354 S.E.2d 486 (1987), a hospital employee was convicted of sexual offense by a custodian, in violation of G.S. § 14-27.7 (a), which at that time made it a Class G felony for "a person having custody of a victim of any age or a person who is an agent or employee of any person, or institution, . . . having custody of a victim" to engage in sexual relations with such victim. *Id.* at 261-62, 354 S.E.2d at 488. The North Carolina Supreme Court held that the trial court erred by aggravating defendant's sentence on the basis that he violated a position of trust. The Court held that "a showing of a relationship of trust and confidence was needed to prove the custodial element of the offense." *Id.* at 266, 354 S.E.2d at 491. In *State v. Tucker*, 357 N.C. 633, 639, 588 S.E.2d 853, 857 (2003), the North Carolina Supreme Court considered *Raines* in the context of the charge of sex offense by a substitute parent, and held:

> To be guilty of sexual offense by a person in a parental role, the defendant must have "assumed the position of a parent in the home of a minor victim." . . . Evidence of a parent-child relationship therefore was necessary to prove that defendant stood in a parental role with regard to the victim. A parent-child relationship is also indicative of a position of trust[.]

In the instant case, the evidence regarding defendant's role in J.B.'s household consisted of the following: (1) Whitfield's testimony that she and defendant were never romantically involved and that she lived with another man who was her boyfriend; (2) Whitfield's testimony that defendant "helped with the kids" and "would just baby sit them" in return for her letting him sleep in her apartment rent-free; (3) A.B.'s agreement with the prosecutor's statement that defendant "took care of [him] while Mama was gone to work"; (4) defendant's statement to McLaughlin that he lived in Whitfield's apartment and "watch[ed] her kids"; and (5) Brown's statement to McLaughlin that Whitfield and defendant were not romantically involved, and that defendant was a "babysitter of [Whitfield's] four children."

The evidence, taken in the light most favorable to the State, is sufficient to establish only that defendant babysat for Whitfield's children. Whitfield clearly did not regard defendant as her boyfriend or a *de facto* stepfather to her children. Thus, defendant's relationship with J.B.'s mother does not provide any support for the conclusion that defendant had assumed the "position of a parent" in J.B.'s household. Nor does the record evidence indicate whether defendant's "babysitting" had a quasi-parental quality, or whether defendant was essentially just a "warm body" at the apartment in case an emergency required the presence of an adult. For example, there was no evidence regarding whether defendant was authorized to make disciplinary decisions, assist with homework, treat minor injuries, decide whether the children could leave the apartment, or take them out of the apartment himself.

Even more significant is the absence of any evidence tending to show that the defendant and J.B. had a relationship based on trust that was analogous to that of a parent and child. Indeed, there is no evidence in the record regarding the relationship between defendant and J.B. Thus, there is no basis to determine whether defendant abused a quasi-parental relationship of trust or simply overpowered his young victim.

We do not accept defendant's argument that a defendant must have certain legal rights, such as the authority to give consent to medical treatment, in order for prosecution under this statute to be appropriate. Nor do we suggest that only stepparents or live-in romantic partners may be prosecuted under G.S. § 14-27.7(a). However, in the instant case, the evidence establishes only the bare fact that defendant was a babysitter. We conclude that the evidence presented by the State in this case was insufficient to estab-

lish that defendant had "assumed the position of a parent in the home of [the] minor." Accordingly, defendant's conviction of violating G.S. § 14-27.7(a) is reversed.

---

**[5]** Defendant argues next that the trial court erred by imposing consecutive sentences, on the grounds that his convictions all arose from the same incident. Preliminarily, we note that the sentence imposed for violation of G.S. § 14-27.7(a) has been vacated and is no longer at issue. Defendant concedes that consecutive sentences are permissible, but argues that the sentence was "excessive and unconstitutional." We find no error. *See Ballew,* 113 N.C. App. 674, 440 S.E.2d 565 (no error where defendant sentenced to consecutive prison terms for two counts of first-degree rape and one count of sexual activity by a substitute parent). This assignment of error is overruled.

---

We have considered the defendant's remaining contentions and find them to be without merit.

In conclusion, defendant's conviction of sexual offense by a substitute parent is reversed. His convictions of first degree statutory sexual offense and indecent liberties are affirmed.

Reversed in part, no error in part.

Judges HUNTER and McCULLOUGH concur.