IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-955

Filed 3 September 2025

Forsyth County, Nos. 21CRS058829-330, 21CRS057793-330

STATE OF NORTH CAROLINA

v.

DAMIEN ALEJANDRO QUITERIO-MORRISON.

Appeal by Defendant from Judgments entered 1 February 2024 by Judge Eric C. Morgan in Forsyth County Superior Court. Heard in the Court of Appeals 22 April 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General J. Joy Strickland, for the State.*

*J. Clark Fischer for Defendant-Appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

Damien Alejandro Quiterio-Morrison (Defendant) appeals from Judgments entered pursuant to jury verdicts finding him guilty of First-Degree Murder and Concealing Unnatural Death by Secretly Burying a Dead Human Body. The Record before us, including evidence presented at trial, tends to reflect the following:

On 5 July 2022, Defendant was indicted for First-Degree Murder and Concealing Unnatural Death by Secretly Burying a Dead Human Body. The case

came on for trial on 22 January 2024. At trial, the State's evidence tended to show that on the evening of 21 May 2021, Isaiah Mitchell and his girlfriend Evelyn Avila-Noyola went to a bar in Winston-Salem. Upon walking in, Avila-Noyola recognized Kevin Patricio Cisneros,[1] Kael Quiterio,[2] and Defendant. Mitchell and Avila-Noyola had been in a relationship for seven years; however, they separated for a six-month period between June 2020 and December 2020. During that time, Avila-Noyola had a romantic relationship with Cisneros.

The three men "kept looking at" Mitchell and Avila-Noyola. Mitchell "got irritated and kind of buck[ed] at [the men] and said, 'what are you looking at.'" The men were "giggling" and talking amongst themselves. Mitchell drove himself and Avila-Noyola home around 1:00 a.m. After arriving home, Avila-Noyola received a call from Defendant's number. Mitchell answered the phone. Avila-Noyola testified Mitchell was "very irritated" and he and the person on the other end of the line were "kind of having a verbal altercation." Mitchell left with his phone, Avila-Noyola's phone, and the keys to his car—a silver Dodge Charger.[3] Avila-Noyola drove to the home of Mitchell's aunt to see if she could contact Mitchell. Their attempts at contacting Mitchell were unsuccessful.

---

[1] Cisneros is referred to in the parties' briefs as "Kevin Patricio," "Kevin Cisneros," and "Kevin Patricio Cisneros."

[2] Quiterio is Defendant's cousin.

[3] Avila-Noyola owned the car, but it was primarily driven by Mitchell.

In the morning, Avila-Noyola still had not heard from Mitchell. Avila-Noyola, some of her friends, and some of Mitchell's family members went to Defendant's and Cisneros' homes to try to find out what had happened. Two vehicles were parked outside of Defendant's home, but no one answered the door. At Cisneros' home, Cisneros said he didn't know where Mitchell was and asserted Mitchell had "never showed up."

Avila-Noyola and Mitchell's family went back to Defendant's home. They "stood out there for the majority of the day[,]" but Defendant never came in or out of the house. The family then reported Mitchell missing. Defendant called Avila-Noyola later that evening; Defendant stated Mitchell "never showed up" and suggested Mitchell "might've got in a car accident."

Outside Defendant's house, officers investigating Mitchell's disappearance found two 45-caliber bullet casings, a pair of earrings Mitchell wore on the night in question, and observed bloodstains on the driveway. Bloodstains containing Mitchell's DNA were also found in Defendant's bedroom and laundry room.

Avila-Noyola's phone was found broken on the street outside Defendant's home. Snapchat messages sent between Avila-Noyola's and Defendant's accounts showed Avila-Noyola's account saying: "[D]on't be a bitch slide." Defendant's account responded with his home address.

Laura Smith, one of Defendant's neighbors, testified she had heard two gunshots around 2:00 a.m. on the morning of 22 May 2021. She went to her window

and saw a Dodge Charger and someone wearing a white shirt with a neon or glow-in-the-dark emblem and "a ball cap[ ]" walking behind the car. Smith "heard a car door" and three more gunshots. She testified the person she saw walking near the car was not Defendant.

Edgar Santamaria, Defendant's cousin, testified Defendant and Cisneros showed up at his house around 2:00 a.m. Defendant had a black eye. Santamaria testified: "I don't recall who told me. But one of them just confessed that they had killed a guy."

The State presented GPS data obtained from Defendant's, Cisneros', and Mitchell's cell phones, tracking their movements on the night in question. The data obtained from Mitchell's cell phone showed it in the area of Defendant's house around 2:08 a.m. Mitchell's phone traveled from Defendant's house to Santamaria's house around fifteen minutes later, at the same time as Defendant and Cisneros. Around 6:00 a.m., Cisneros' and Defendant's phones traveled west, but Mitchell's phone remained at Santamaria's address. Around 9:54 a.m., Mitchell's phone "lost connection with the network for some reason." No data was available from Mitchell's phone after that, and Mitchell's phone was never found.

Defendant's and Cisneros' phones traveled to the area of a "horse track" in Yadkin County. Defendant and Cisneros remained at the horse track for approximately thirty minutes before "return[ing] to the area of Winston-Salem to the area of [Defendant's] house and then they split up."

Defendant remained at home for approximately thirty minutes before going to a landfill around 8:30 a.m. Later in the day, Defendant "went to play a soccer game and also went to the Dollar General." Video footage obtained from the Dollar General showed Defendant buying "a container of purple power degreaser and a container of bleach." A 9-millimeter gun belonging to Defendant was found near the soccer field. The shell casings found outside Defendant's house did not correspond to the gun found near the soccer field, but they did match one of the two other guns Defendant owned.

Defendant went "back to the area of Winston-Salem and ultimately to the area around his house." An officer preparing a search warrant outside Defendant's house observed Defendant's truck "start to turn on [the street] before veering" away and leaving the area. Defendant drove to his mother's house instead.

Video footage obtained from security cameras outside the home of Defendant's mother showed that around 4:32 p.m. on 23 May 2021, Defendant's truck was parked outside his mother's home and something was being burned behind it. Around 4:46 p.m., Defendant's mother took a bag and placed it in a trashcan outside. One of Defendant's sisters later provided the bag to the police—it contained a pair of white sneakers which had been burnt. Around 5:32 p.m., Cisneros and his father are shown on the security camera footage, and "people start hugging." Detective Ognosky, the lead detective on the case, testified: "It appears they are saying goodbye to each other." The men got into a car driven by Defendant's mother. Detective Ognosky

explained this was "the last time anyone has seen [Cisneros] since this incident happened."

On or about 24 May 2021, Defendant's truck was found abandoned on the side of the road with the keys in it. Mitchell's vehicle was later found less than two miles away from Santamaria's house.

At the close of the State's evidence, defense counsel made a Motion to Dismiss on the basis there was insufficient evidence to support each charge and also asserted a variance existed between the crimes alleged in the indictments and the crimes for which the State presented evidence. The trial court denied this Motion.

Defendant testified on his own behalf. Defendant's testimony largely corroborated the State's order of events, but he disputed the extent of his involvement in Mitchell's murder. Defendant testified he was with Cisneros at the same bar as Avila-Noyola and Mitchell on the night in question. Cisneros wore a pair of white sneakers borrowed from Defendant. Defendant drove home from the bar with Cisneros shortly before 2:00 a.m. Cisneros allegedly used Defendant's phone to text someone during the drive. Defendant explained he would often let Cisneros use his phone to contact women, including Avila-Noyola, because Cisneros "had a girlfriend that lived with him at his house. And due to that, and him cheating, he did not want her to find that out. So he texted her through my accounts."

After arriving at Defendant's house, Cisneros allegedly told Defendant he had invited someone "to fight." Defendant testified he told Cisneros this was not a good

idea and he would take Cisneros home instead. Cisneros agreed, but as the men were getting into Defendant's truck to leave, Mitchell arrived. Cisneros was already in the truck with the door closed; Defendant was standing outside on the driver's side of the vehicle. Mitchell punched Defendant in the face. The two men continued to fight until Defendant "heard two gunshots[.]" Defendant testified he saw Cisneros standing "five to six feet" away holding a gun.

The men left Mitchell's body outside and went back into the house. Defendant testified Cisneros said he was going to Santamaria's house to "hide and to think about his next move." Mitchell's body was allegedly already no longer outside when Defendant followed "a minute" to "a minute and a half" after. Cisneros left in Mitchell's car. Defendant followed in his truck.

Defendant testified he arrived at Santamaria's house first, woke Santamaria up, and told Santamaria "not [to] ask any questions . . . but [Cisneros] did kill someone[.]" After Cisneros arrived, Defendant asked him "why he brought the body to Edgar Santamaria's house." Cisneros responded "he didn't," that it was Defendant who had brought the body. Defendant went outside and discovered Mitchell's body in the bed of his truck. Defendant denied assisting Cisneros in placing Mitchell's body in the truck. He testified he did not know Cisneros had placed the body there

because the truck is lifted so that its bed is six feet high, whereas Defendant is only five-foot-five.[4]

Defendant testified he felt "horrible because now I felt directly involved in this murder." Defendant further testified he was upset Cisneros had put Mitchell's body in his truck because Defendant "took a lot of pride" in his vehicle and it "was a clear disrespect for [his] vehicle." Defendant gave Cisneros the keys to his truck and told Cisneros "he needed to do whatever he needed to do that I'm not going to be involved in this any further."

Defendant went back inside Santamaria's house and fell asleep on the couch. Two to three hours later, Cisneros woke Defendant up and told Defendant "we're going to go get rid of this body." Defendant testified that when he expressed reluctance, Cisneros became more "aggressive." Defendant testified he was scared that he "was going to be shot next." The two men then left Santamaria's house; Defendant led with Cisneros following behind. The men drove to the horse track where Cisneros dug a ditch. Defendant remained in his truck until Cisneros signaled him to bring Mitchell's body. Defendant turned his truck around and "pull[ed] the body off of the bed of the truck." Defendant testified: "I actually by myself, I grabbed [Mitchell] by his clothes and dragged him off the vehicle." Cisneros backfilled the ditch.

---

[4] Defendant testified Cisneros is only "an inch or two taller" than himself. Mitchell was described as "Close to 6 feet tall."

The men left and Defendant drove "straight home." Defendant then went to the landfill to get rid of "household items." Defendant called Cisneros eight times while there. During one of those phone calls, Defendant told Cisneros to "hurry up and move [Mitchell's] car from [in front of Santamaria's house]." Defendant then returned home. Later that afternoon, Defendant went to go play soccer to "relieve" his "stress." After that, Defendant purchased bleach and degreaser to clean his truck. Consistent with the State's evidence, Defendant testified he saw police outside his house when he went to return home, so he drove to his mother's home instead.

The next day, Cisneros allegedly tried to convince Defendant to lie to the police about what had happened and tell them Defendant had driven Cisneros straight home from the bar. Defendant refused, fearing "if I was to tell that story that they there [sic] going to say that I had all guilt on me, that I was the only one there[.]" Later that day, Defendant met Cisneros and Cisneros' mother at a Goodwill, and Cisneros again tried to convince Defendant to lie to the police. According to Defendant, Cisneros' mother "pointed out" that if Defendant didn't "want to talk to police at any point then it's probably best if we [Defendant and Cisneros] go to Mexico." Defendant returned to his mother's home and asked his father to bring him a change of clothes and the shoes Cisneros had borrowed from him. Defendant testified he burned the shoes because there was blood on them, and he was worried the police "would be able to get DNA to prove that they are my shoes."

Defendant agreed to go to Mexico with Cisneros later that day. He testified he did not tell either of his parents he was going to Mexico; he allegedly told his father he was "going out of state" and told his mother he was "going to Texas." Defendant's mother drove Defendant and Cisneros to Texas. The men then took a taxi to the border and crossed into Mexico. In September, Defendant learned there was a warrant out for his arrest. Defendant retained a lawyer and flew back to North Carolina to turn himself in.

Outside the presence of the jury, defense counsel presented testimony from Giovanni Quiterio-Olmedo, Defendant's father, regarding a conversation which took place between Quiterio-Olmedo and Cisneros shortly after the events at issue. On *voir dire*, Quiterio-Olmedo testified Cisneros told him Defendant was "not involved":

> [Defense Counsel]: Did you ask . . . where [Defendant] was?
>
> [Quiterio-Olmedo]: So it's – first of all [Cisneros] started telling me . . . kept saying that [Defendant] was not involved, I did it, I did it because [Mitchell] was choking [Defendant].
>
> . . . .
>
> [The State]: And [Cisneros] told you [Defendant] was not involved, I did it because [Mitchell] was choking him?
>
> [Quiterio-Olmedo]: Yes.
>
> . . . .
>
> [The State]: So [Cisneros] had committed a murder?
>
> [Quiterio-Olmedo]: That's what he confessed to me in my house.

Defense counsel sought to admit this testimony under Rule 804(b)(3) of the North Carolina Rules of Evidence. The trial court determined the testimony was not admissible because Cisneros was not unavailable as a witness and there was insufficient evidence of corroborating circumstances as to the trustworthiness of the statement.

At the close of all evidence, defense counsel renewed the Motion to Dismiss. The trial court denied the renewed Motion.

On 1 February 2024, the jury returned verdicts finding Defendant guilty of First-Degree Murder on the basis of felony murder and guilty of Concealing Unnatural Death by Secretly Burying a Dead Human Body. That same day, the trial court entered Judgments in accordance with the verdicts. On 6 February 2024, Defendant timely provided Notice of Appeal.

## Issues

The issues on appeal are whether the trial court erred by: (I) excluding Giovanni Quitero-Olmedo's testimony that Kevin Patricio Cisneros told him Defendant was "not involved"; and (II) denying Defendant's Motions to Dismiss.

## Analysis

I.  Hearsay

Defendant argues the trial court incorrectly determined Cisneros' statement was not admissible under Rule 804(b)(3). Specifically, Defendant argues Cisneros was "unavailable" as a witness for the purposes of Rule 804 and there was evidence

of corroborating circumstances indicating the trustworthiness of Cisneros' statement to support its admission under Rule 804(b)(3).

Under Rule 804(b)(3), if a declarant is unavailable as a witness, his statement may nevertheless be admissible at trial if "at the time of its making . . . [the statement] so far tended to subject him to civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." N.C. Gen. Stat. § 8C-1, Rule 804(b)(3) (2023). However, "[a] statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* We review a trial court's decision whether to admit a statement under Rule 804(b)(3) for abuse of discretion. *See State v. Dewberry*, 166 N.C. App. 177, 183, 600 S.E.2d 866, 870 (2004).

Here, the trial court concluded Cisneros' statement was inadmissible both because: 1) he was not "unavailable" as a witness, and 2) there was insufficient evidence of corroborating circumstances clearly indicating the trustworthiness of the statement for the purposes of Rule 804(b)(3). " 'Unavailability as a witness' includes situations in which the declarant . . . [i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . by process or other reasonable means." N.C. Gen. Stat. § 8C-1, Rule 804(a) (2023). "To review a trial court's determination that a witness is unavailable, our Court considers 'whether the trial court's findings of fact related to the witness' unavailability were supported by

the evidence and, in turn, supported its conclusions of law.' " *State v. Allen*, 265 N.C. App. 480, 484, 828 S.E.2d 562, 566 (2019) (quoting *State v. Clonts*, 254 N.C. App. 95, 114, 802 S.E.2d 531, 545 (2017)).

In the case *sub judice*, the trial court determined Cisneros was not "unavailable" as a witness for the purposes of Rule 804(b)(3) because Cisneros' "absence [was] due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying." The trial court found Cisneros' absence was due to Defendant and his family helping Cisneros flee to Mexico.

Defendant argues "nothing in the record supports a conclusion that [he] had any role in Cisneros' non-attendance at trial." However, the Record shows Defendant and Cisneros agreed to go to Mexico together, Defendant and Cisneros said goodbye to each other's families together at the home of Defendant's mother, Defendant's mother drove Defendant and Cisneros to Texas, the men entered Mexico together, and the men stayed together in Mexico City until Defendant left to live elsewhere in Mexico. Thus, contrary to Defendant's assertion, the evidence tended to show both Defendant and his family were involved in transporting Cisneros out of the country. Therefore, the trial court's Finding that Cisneros' absence was due to Defendant's actions is supported by the Record.

Defendant additionally asks us to consider this Court's decision in *State v. Allen*. In *Allen*, this Court affirmed the trial court's conclusion that the State's

witness was unavailable for the purposes of Rule 804. The State's evidence its witness was unavailable included that it had subpoenaed the witness and, despite the witness agreeing to appear in court and testify against the defendant, the witness had been missing for approximately ten days at the time of the evidentiary hearing. *Allen*, 265 N.C. App. at 484-87, 828 S.E.2d at 566-68. This Court held this was sufficient evidence the State had "utilized reasonable means and made a good faith effort to obtain the witness' presence at trial." *Id.* at 488, 828 S.E.2d at 568.

Defendant contends Cisneros could "obviously" not be subpoenaed because Cisneros was out of the country,[5] and his unavailability was "thus even greater than the missing" witness in *Allen*. Defendant argues the "federal government" made "diligent efforts" to find Cisneros but was unsuccessful; therefore, according to Defendant, Cisneros, like the witness in *Allen*, was unavailable for the purposes of Rule 804. We disagree.

Regardless of any efforts taken by the State or "federal government" to extradite Cisneros from Mexico, the burden is on Defendant—as proponent of Cisneros' statement—to show *he* has been unable to procure Cisneros' attendance. *See* N.C. Gen. Stat. § 8C-1, Rule 804(a)(5) (2023) (a witness is unavailable if he is "absent from the hearing and *the proponent of his statement has been unable to procure his attendance . . .* by process or other reasonable means." (emphasis added)).

___

[5] However, in arguing he had taken steps to secure Cisneros' presence at trial, defense counsel told the trial court that it had "sent a subpoena" to Cisneros.

To the extent Defendant relies on the State or "federal government's" efforts to locate Cisneros, it is insufficient to meet his burden of proving Cisneros' unavailability under Rule 804. Defendant argues "If the State, with the assistance of the bountiful resources of the federal government could not bring Cisneros to justice, obviously Defendant had no means either to serve or enforce compulsory process." Indeed, Defendant essentially concedes he failed to exercise any efforts of his own to secure Cisneros' attendance at trial, simply because the State's efforts had been unsuccessful.

Although the proponent of a statement under Rule 804 is not required to "exhaust all conceivable means" in the effort to secure a witness' presence at trial, *see State v. Bailey*, 163 N.C. App. 84, 90, 592 S.E.2d 738, 743 (2004), it is relevant whether "there were other methods available" to the proponent in securing the declarant's presence at trial. *See Clonts*, 254 N.C. App. at 124, 802 S.E.2d at 550 (citing *State v. Nobles*, 357 N.C. 433, 437-38, 584 S.E.2d 765, 770 (2003)). Here, no evidence details any efforts Defendant took to secure Cisneros' presence at trial, other than pointing to the State's or "federal government's" unsuccessful attempts to contact Cisneros—even though Defendant knew where in Mexico Cisneros had fled to, knew where in Mexico Cisneros had family, had stayed in Mexico with Cisneros for some time, and has a close relationship with Cisneros' family in North Carolina. Thus, Defendant has not shown he made a good-faith effort to secure Cisneros' testimony or attendance at trial. *See State v. Harris*, 338 N.C. 211, 223 n.1, 449

S.E.2d 462, 468 n.1 (1994) ("[T]o take advantage of the hearsay exceptions under Rule 804(b), the proponent must, under Rule 804(a)(5), show at least a good-faith, genuine, and bona fide effort to procure the declarant's attendance . . . ." (quoting 32B Am. Jur. 2d *Federal Rules of Evidence* § 265 (1982)) (second citation omitted)). Therefore, Defendant has not met his burden of proving Cisneros was unavailable for the purposes of Rule 804.

Even assuming, *arguendo*, Cisneros was unavailable to testify for the purposes of Rule 804, the trial court further found Cisneros' statement would not be admissible under Rule 804(b)(3) because there were insufficient corroborating circumstances as to the trustworthiness of the statement. *See* N.C. Gen. Stat. § 8C-1, Rule 804(b)(3) (2023) ("A statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement.").

" 'The determination of whether the trustworthiness of the statement is indicated by corroborating circumstances is a preliminary matter to be decided by the trial judge.' " *Dewberry*, 166 N.C. App. at 181, 600 S.E.2d at 869 (quoting *State v. Wardrett*, 145 N.C. App. 409, 415, 551 S.E.2d 214, 218 (2001)). "The facts and circumstances surrounding the commission of the crime and the making of the declaration must corroborate the declaration and indicate the probability of trustworthiness." *Id.* at 182, 600 S.E.2d at 870 (quoting *State v. Haywood*, 295 N.C. 709, 730, 249 S.E.2d 429, 442 (1978)).

Defendant argues the trial court erroneously failed to inquire into Cisneros' "motivation to speak truthfully" to Quiterio-Olmedo. In support of his argument, Defendant asks us to consider our Supreme Court's decision in *State v. Sargeant*, 365 N.C. 58, 707 S.E.2d 192 (2011). However, unlike the case at bar, the Court's analysis in *Sargeant* concerned Rule 804(b)(5)—the residual hearsay exception for an unavailable witness. *See id.*; *see also State v. Triplett*, 316 N.C. 1, 10-11, 340 S.E.2d 736, 742 (1986) (explaining the trial court must consider "the declarant's motivation to speak the truth or otherwise[ ]" for the purposes of Rules 803(24) and 804(b)(5)). By contrast, under Rule 804(b)(3), "[b]road discretion must be given the trial judge in determining the reliability of the declaration and the declarant by consideration of such factors as spontaneity, relationship between the accused and the declarant, existence of corroborative evidence, whether or not the declaration had been subsequently repudiated and whether or not the declaration was in fact against the penal interest s [sic] of the declarant." *Dewberry*, 166 N.C. App. at 182, 600 S.E.2d at 869-70 (emphasis removed) (quoting *Wardrett*, 145 N.C. App. at 415, 551 S.E.2d at 218-19).

Here, in concluding insufficient evidence corroborated Cisneros' alleged statement, the trial court made the following Findings of Fact: Quiterio-Olmedo was an "interested witness"—i.e., Defendant's father; Quiterio-Olmedo did not provide this information to the police when he first spoke to them two years prior, despite having an interest in doing so; over two years had passed since the statement was

first allegedly made; and the statement was inconsistent with the other testimony in the case.

Defendant argues the trial court's Findings "fall far short" of allowing the conclusion Cisneros' statement lacked corroborating circumstances. Defendant contends the trial court's Finding that the statement was inconsistent with the other testimony in the case is unsupported. We disagree. The evidence adduced at trial tended to show Defendant's phone and Snapchat account were used to invite Mitchell to fight; Mitchell was told to come to Defendant's address, not Cisneros'; Defendant testified Mitchell was shot with "My bullets in my pistol[ ]"; and Defendant moved and disposed of Mitchell's body. Thus, there was ample evidence contradicting Cisneros' alleged statement. Moreover, Quiterio-Olmedo also made inconsistent statements on *voir dire* about his actions the day Defendant and Cisneros fled to Mexico and what information he had previously given to law enforcement. *See Wardrett*, 145 N.C. App. at 415-16, 551 S.E.2d at 219 (noting elements of witness' testimony undermined his credibility, such as being unable to remember when and under what circumstances the statement at issue was allegedly made).

The trial court's additional Findings—that Quiterio-Olmedo was an interested witness, Quiterio-Olmedo did not provide the statement to law enforcement, and that the statement was allegedly made by Cisneros over two years ago—are likewise supported by competent evidence. These Findings support the trial court's Conclusion there were insufficient independent, non-hearsay indications of

trustworthiness to support admitting the statement at trial. Thus, in light of all the evidence, Defendant has failed to show the trial court abused its discretion in concluding the statement was not admissible under Rule 804(b)(3). Therefore, the trial court did not err in excluding this portion of Quiterio-Olmedo's testimony.

II.  Motions to Dismiss

Defendant contends the trial court erred in denying his Motions to Dismiss the charge of First-Degree Murder. "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted). "Upon [a] defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984) (citation omitted). "If the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion [to dismiss] should be allowed." *Fritsch*, 351 N.C. at 378, 526 S.E.2d at 455 (citation omitted).

"In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State,

giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994) (citation omitted). However, "[w]hether the State has offered such substantial evidence is a question of law for the trial court." *State v. McKinney*, 288 N.C. 113, 119, 215 S.E.2d 578, 583 (1975) (citations omitted).

"When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence." *Fritsch*, 351 N.C. at 379, 526 S.E.2d at 456 (citation omitted). Moreover, "the defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence." *Id.* at 379, 526 S.E.2d at 455 (citing *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982)).

On appeal, Defendant challenges the denial of his Motions to Dismiss solely with respect to the charge of First-Degree Murder on the basis of felony murder.[6] "A murder which shall be . . . committed in the perpetration or attempted perpetration of any . . . robbery . . . shall be deemed to be murder in the first degree." N.C. Gen. Stat. § 14-17 (2023). Defendant argues there was insufficient evidence he committed the predicate felony—robbery with a firearm—to be found culpable of felony murder. Our statutes provide that "[a]ny person . . . who, having in possession or with the use or threatened use of any firearms, . . . unlawfully takes or attempts to take personal

---

[6] Defendant also does not pursue his argument asserting a variance in the indictments.

property from another" is guilty of robbery with a firearm. *Id.* § 14-87(a) (2023).

Defendant argues there was no evidence of an "agreement" between himself and Cisneros to steal from Mitchell, nor evidence he had "advance knowledge" Cisneros would take Mitchell's car or phone, nor any evidence he encouraged Cisneros to do so. However, presuming this is true, there is nonetheless sufficient evidence Defendant committed robbery with a firearm in the chain of events after Mitchell's murder. *See State v. Handy*, 331 N.C. 515, 529, 419 S.E.2d 545, 552 (1992) ("The evidence is sufficient to support a charge of felony murder based on the underlying offense of armed robbery where the jury may reasonably infer that the killing and the taking of the victim's property were part of one continuous chain of events." (citations omitted)).

Here, the evidence taken in the light most favorable to the State tends to show Defendant's phone and Snapchat account were used to invite Mitchell to Defendant's house to fight; Mitchell was shot with Defendant's gun; Defendant and Cisneros both went to Santamaria's house shortly after Mitchell was shot; Mitchell's body, the car he was driving, and cell phone were taken to Santamaria's house; the last known location of Mitchell's phone was Santamaria's house; Defendant directed Cisneros to get rid of Mitchell's car; and Mitchell's car was found near Santamaria's house. The jury could have found from this evidence that Defendant was involved in taking Mitchell's car and cell phone while he was in possession of or with the use of a firearm. *See* N.C. Gen. Stat. § 14-87(a) (2023).

Moreover, "Felony murder based on armed robbery does not depend on whether the intent to commit the taking of property was formed before or after the killing." *State v. Coleman*, 161 N.C. App. 224, 231-32, 587 S.E.2d 889, 894 (2003) (citing *Handy*, 331 N.C. at 529, 419 S.E.2d at 552). Thus, whether Defendant's intent to take Mitchell's property was formed before or after the shooting took place is irrelevant to our analysis. *See id.* Therefore, there was substantial evidence tending to show Defendant committed robbery with a firearm. Consequently, the trial court properly denied Defendant's Motions to Dismiss. In turn, the trial court did not err in entering Judgments on the verdicts.

## **Conclusion**

Accordingly, for the foregoing reasons, we conclude there was no error at trial and affirm the Judgments of the trial court.


NO ERROR.

Judges STROUD and TYSON concur.